## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **Sealed** Public and unofficial staff access to th 't are prohibited by court order. |
| | § | |
| v. | § | **H 11        116** |
| | § | |
| | § | CRIMINAL NO. |
| MARIA ROJAS aka "NANCY" | § | |
| JOSE LUIS ROJAS | § | United State District Court |
| JAVIER BELMONTES | § | Southern District of Texas FILED |
| MADAY MARTINEZ aka "YVONNE" | § | |
| EVELIN CAROLINA AGUERO | § | FEB 1 5 2011 |
| SILVANO SANTOS aka "CHIVAS" | § | |
| CLAUDIA LNU | § | David J. Bradley, Clerk of Court |
| OLVAN LNU | § | |
| ALEYDA LNU | § | **UNSEALED** |
| FRANCISCO LNU aka "PANCHO" | § | **PER ORDER** |

## CRIMINAL  INDICTMENT

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times material herein:

1.      MARIA ROJAS aka NANCY (hereinafter "NANCY"), a previously

deported and undocumented alien, owned, controlled, and operated bars and

restaurants, including LA COSTEÑITA, formerly named PLAYA SOLA, at 8403

Clinton Drive,  the adjacent property located at 8303 Clinton Drive, and EL CLUB

RESTAURANTE, formerly named LA CUEVA RESTAURANTE BAR, located at 8037 Clinton Drive, all in Houston, Texas.

2. JOSE LUIS ROJAS (hereinafter "ROJAS"), an undocumented alien, operated LA COSTEÑITA in Houston, Texas, at 8403 Clinton Drive and the adjacent property located at 8303 Clinton Drive for his sister, NANCY.

3. JAVIER GUEVARA BELMONTES (hereinafter "JAVIER") co-owned, controlled, and operated LA COSTEÑITA at 8403 Clinton Drive, and EL CLUB RESTAURANTE located at 8037 Clinton Drive, in Houston, Texas.

4. MADAY MARTINEZ aka YVONNE (hereinafter "YVONNE"), an undocumented alien, served as a manager for the bar named LA COSTEÑITA, located at 8403 Clinton Drive, and the adjacent property located at 8303 Clinton Drive.

5. EVELIN CAROLINA AGUERO (hereinafter "CAROLINA"), an undocumented alien, served as a manager of LA COSTEÑITA, located at 8403 Clinton Drive and the adjacent property located at 8303 Clinton Drive.

6. CLAUDIA LNU (hereinafter "CLAUDIA"), an undocumented alien, worked in the 8303 Clinton Drive, a location used for prostitution. She served as a

"lookout", alerting police presence and cleaned the prostitution rooms.  She handed out condoms and charged the females $15.00 for the condoms and rooms.

7.    SILVANO SANTOS aka CHIVAS (hereinafter "CHIVAS"), an undocumented alien, worked for NANCY and ROJAS at LA COSTEÑITA as a "lookout", alerting police presence and locking  gates leading to the 8303 property to prevent or delay law enforcement from entering the property.  He also worked as a "lookout" in the parking lot area of 8403 Clinton Drive.

8.    FRANCISCO LNU aka PANCHO (hereinafter "PANCHO"), an undocumented alien,  worked for NANCY and ROJAS at LA COSTEÑITA as a "lookout", alerting police presence and locking gates leading to the 8303 property to prevent or delay law enforcement from entering the property.  He also worked as a "lookout" in the parking lot area of 8403 Clinton Drive.

9.    OLVAN LNU (hereinafter "OLVAN"), an undocumented alien, worked for NANCY and ROJAS at LA COSTEÑITA as a "lookout", alerting police presence and locking gates leading to the 8303 property to prevent or delay law enforcement from entering the property.  He also worked as a "lookout" in the parking lot area of 8403 Clinton Drive.

10.    ALEYDA LNU (hereinafter "ALEYDA"), an undocumented alien, worked in the property located at 8303 Clinton Drive.  She handed out condoms and charged the females $15.00 for the condoms and rooms.

11.    "R.A.O.", an undocumented alien, minor Mexican female, born in June 1989.

12.    "F.Y.P.D.", an undocumented alien, minor Mexican female, born in May 1994.

13.    "E.C.P." , an undocumented alien, adult Mexican woman,  born in May 1976.

14.    "I.F.H." , an undocumented alien, Mexican woman, born in May 1982.

15.    "R.M.G.", an undocumented alien, Mexican woman, born in January 1978.

16.    "G.P.M.", an undocumented alien, Mexican woman, born in May 1988.

17.    "M.R.G.", an undocumented alien, minor Mexican woman, born in July 1984.

18.    "I.L.A.", an undocumented alien, Mexican woman, born April 1980.

19.    "G.C.B.S.", an undocumented alien, Mexican male, born April 1960.

## COUNT ONE
## Sex Trafficking Conspiracy
### [(Title 18, Sections 1591 and 1594(c)]

A.     **INTRODUCTION**

20.     The introductory allegations as set forth in paragraphs 1 through 19 are

realleged and incorporated as if fully set out herein.

B.     **THE CONSPIRACY**

Beginning in or about August 1999, and continuing until the date of this

indictment, in the Houston Division of the Southern District of Texas and elsewhere,

defendants,

**MARIA ROJAS aka "NANCY"**
**and**
**JOSE LUIS ROJAS,**

together and with others known and unknown to the Grand Jury, did knowingly and

intentionally conspire, combine, confederate and agree, to commit offenses against

the United States; that is:

a.     To, in and affecting interstate and foreign commerce, recruit, entice,

harbor, transport, provide and obtain by any means young Mexican women and girls,

and benefit, financially and by receiving a thing of value, from participation in a

venture which engaged in such acts, knowing and in reckless disregard of the fact that

force, fraud and coercion, as defined in Title 18, United States Code, Section 1591,

4

would be used to cause the young Mexican women and girls to engage in commercial sex acts, contrary to Title 18, United States Code, Section 1591, and

b.     To, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide and obtain by any means young Mexican girls, and benefit, financially and by receiving a thing of value, from participation in a venture which engaged in such acts, knowing and in reckless disregard of the fact that such girls had not attained the age of 18 years and knowing that they would be caused to engage in a commercial sex act, contrary to Title 18, United States Code, Section 1591.

C.     **THE OBJECT**

21.     It was the object of the conspiracy to initially recruit, entice and transport Mexican women and girls to the United States, and to make them work in brothels owned by the conspirators, located within the Southern District of Texas and elsewhere for their financial benefit, maintaining their service through force, threats of force and psychological coercion to effectuate the repayment of a smuggling debt. Later, on or about 2003, the conspirators decided to rely mostly on Mexican pimps (called "padrotes") to bring the women they forced into prostitution to work at the conspirators' brothel/bar to avoid having to control them and make sure the women did not escape.

6

D.    **MANNER AND MEANS**

22.    Initially it was part of the plan and purpose of the conspiracy that one or more of the defendants would use GREGORIA VAZQUEZ aka BLANCA (hereinafter "BLANCA") to routinely recruit, with some help of family members of the conspirators, and arrange for the smuggling of women and girls from Mexico, (hereinafter "the Mexican women and girls") to travel to the United States with the expectation of legitimate jobs in restaurants upon their arrival in the Houston, Texas area.

23.    It was a further part of the conspiracy that the conspirators would arrange to smuggle Mexican women and girls into the United States for the purpose of prostituting them against their will in the defendants' bar/cantina, and holding them in debt and servitude in the defendants' restaurant. The conspirators would double the cost for the trip to the United States. If the smuggler/coyote charged $2,000 per girl, the conspirators would tell the girl she owed $4,000 for her trip.

24.    It was a further part of the conspiracy that the conspirators would require the Mexican women and girls to work in their bar and restaurant as prostitutes until they had repaid, through deductions from their earnings, their debts to the conspirators.

25.    It was a further part of the conspiracy that the conspirators used force,

7

threats of force, and forms of coercion to compel and maintain the service of the Mexican women and girls until their debts were paid.

26.     In furtherance of the conspiracy, the conspirators decided it was easier to rely on pimps/padrotes to supply Mexican women and girls for their brothel to ensure control of the Mexican women and girls and prevent their escape.   Instead, they would profit by charging $15.00 for providing a room for the sex act as well as condoms.  The Mexican women and girls charged $65 for 15 minutes of sex with customers.  The Mexican women and girls kept $50 of the $65 and the $15 went to the business as outlined above. The $15 fee for the condoms and rooms provided the conspirators a minimum of $5,000 a day on Fridays, Saturdays, and Sundays, on top of the $25,000-$26,000 a week in beer sales.  The $50 that remained in the hands of the Mexican women and girls was taken from them by their individual pimps/padrotes at the end of the day.

27.     It was a further part of the conspiracy that the conspirators utilized an adjacent property to the bar/cantina, owned by the conspirators with an address of 8303 Clinton Drive, for the customers to engage in commercial sex acts with the women and girls.  A network of "lookouts" (people who would be vigilant, actively looking for the presence of law enforcement) would alert the business and lock the gates leading to the adjacent property (8303 Clinton Drive) if law enforcement presence was detected.  In the bar, all prostitution activity (solicitation of prostitution)

would cease until they felt it was safe to continue their normal criminal activity.

28.     It was a further part of the conspiracy that, during their normal criminal activity, a person employed by the conspirators, in the 8303 Clinton Drive property, would provide a folded paper towel containing a condom to the Mexican women and girls as they walked to the rooms with the customer. On the way back, after engaging in the sex act, the Mexican women and girls would stop and pay this person the $15 fee for the condom and room.

29.   It was a further part of the conspiracy that conspirators would have the Mexican women and girls who were minors, get false identification cards from flea markets and other places.   The conspirators, directly or through their managers, would convey to the minors that they also needed to change their appearance in order to look older by changing the way they fixed their hair and used their makeup.

30.     It was a further part of the conspiracy that conspirators, in order to avoid detection by law enforcement, distanced themselves from the business. The conspirators had managers running the day to day operations; however, the managers still had to get approval from the conspirators to employ the Mexican women and girls that were brought to engage in prostitution. At times the conspirators told the managers to have the Mexican women and girls come by the restaurant, which served

as the conspirators' base of operations, so they could give a final approval to the employment of the Mexican women and girls as prostitutes.

E.     **OVERT ACTS**

31.     In furtherance of the conspiracy and to effect the objects thereof, within the Southern District of Texas and elsewhere, the defendants, together with others known and unknown to the Grand Jury, committed and caused to be committed at least one of the following overt acts, among others:

a.     In or about August 1999, in Mexico, BLANCA, at the direction of the conspirators, made the arrangements for I.L.A. to illegally travel to the United States with transportation and smuggling fees to be repaid through work as a prostitute in the conspirators' bars. I.L.A. was told she would be working as a waitress in a restaurant.

b.     From on or about August 1999 through 2001, the conspirators had Mexican women and girls smuggled into the United States, including 3 minors who were smuggled into the United States to work for the conspirators at LA COSTEÑITA as prostitutes. When there were females under the age of 18 wanting to work at LA COSTEÑITA, NANCY instructed that female or her pimp to go to a nearby Fiesta Supermarket to provide a false name, date of birth, and address to obtain an identification card showing them to be at least 21 years of age. Sometime

in 2000, NANCY and JAVIER discussed the need for having a false identification card with a 17 year old who was working for them as a prostitute.

      c.     From in or about 2000 through 2002, conspirator ROJAS struck I.L.A. several times, placed a gun to her abdomen while she was pregnant and threatened to kill her and her baby.

      d.     In or about September 2003, the conspirators threatened I.L.A. with harming her family in Mexico should she refuse to engage in prostitution. These threats coupled with the violent nature of ROJAS in the past caused her to comply with their demand to engage in prostitution.

      e.     In about October 2005, I.L.A. was beaten by conspirator ROJAS.

      f.     In or about October 2005, I.L.A. was standing in front of LA COSTEÑITA with her face bruised and swollen.

      g.     In or about April 2005, M.R.G., a minor, was taken by a person to LA COSTEÑITA to work as a prostitute. Upon arrival, that person and M.R.G. approached the bartender about M.R.G. working there. The bartender asked for M.R.G.'s identification and M.R.G. provided a false voter's registration identification from Mexico that EL GALLO's group obtained for her in Mexico. The identification showed her to be 21 or 22 years old. The bartender said it was okay for her to start

working but that person or M.R.G. needed to talk to NANCY. Later that evening, ROJAS came into the bar and that person spoke to him about M.R.G. working there as a prostitute. ROJAS told that person to talk to NANCY to get permission from her. A couple of days after this, that person had a conversation with NANCY at LA COSTEÑITA. Shortly after the conversation with NANCY, that person told EL GALLO that NANCY gave M.R.G. the job at LA COSTEÑITA.

       h.     In or about June 2005, that person took R.A.O. along with M.R.G. to LA COSTEÑITA. It would be R.A.O.'s first day at this brothel. That person talked to the male bartender who told that person that he could not hire R.A.O. and that she would have to talk to NANCY or ROJAS. However, ROJAS allowed R.A.O. to remain at LA COSTEÑITA as a prostitute awaiting NANCY's final approval.

       i.     In or about September 2003, R.M.G. arrived in the United States and was forced to engage in prostitution at LA COSTEÑITA by her pimp for fifteen days. While working at LA COSTEÑITA, R.M.G. met the owner, conspirator NANCY. She also met a person she thought was the owner's nephew, conspirator ROJAS. ROJAS collected the money ($15 for the room and condom) from R.M.G. and passed out condoms to R.M.G.

       j.     During the 15 days R.M.G. worked at LA COSTEÑITA, the girls who resisted engaging in prostitution would be mistreated and degraded. The

pimps screamed at them, slapped, hit, and kicked them. Both NANCY and ROJAS saw the abuse and assaults which took place at the bar, but did nothing to stop the behavior. When a customer tried to interfere, NANCY told the customer to leave them alone because that girl was the pimp's girl.

k.     On or about June 11, 2008, F.Y.P.D., a 14 year old female was working at LA COSTEÑITA as a prostitute.

l.     In or about 1999, G.C.B.S. started working for NANCY at LA COSTEÑITA. Around this time, NANCY had approximately five girls who were between the ages of 16 and 17 who were working as prostitutes at LA COSTEÑITA. The girls told ROJAS they were illegal aliens who had been smuggled into the United States.

m.     In or about 1999, NANCY told ROJAS to drive the minor girls to the flea market to get false identifications. ROJAS told the minors he would take them to a flea market on Highway 59 in order to get them a false identification that would show them to be older. Later, the minors had false identifications.

n.     From in or about 1999 to May 2008, NANCY told the pimps on several occasions that they had to get their girls identifications because they were minors.

o.      In or about 2005, NANCY told ROJAS  she was not smuggling any more women from Mexico to the United States.  Instead, she told ROJAS that she would talk to the pimps and just have them supply the girls.  This way she would not have to worry about controlling them or risking the girls escaping before the girls paid their smuggling debt and before she got out of them everything she could.

p.      In or about 2005, ROJAS hired  R.A.O., a minor female, who he said would make a lot of money for the business.

q.      From in or about 1999 to May 2008, ROJAS asked for identification from those individuals wanting to work at LA COSTEÑITA.  He would then tell those individuals who were minors to go to the flea market and get a false identification in order to work at LA COSTEÑITA.

r.      From in or about 1999 to May 2008, on many occasions, CHIVAS,  CAROLINA,  YVONNE, CLAUDIA, and PANCHO, discussed being deported for being undocumented aliens if the police raided LA COSTEÑITA. All of them expressed this fear to each other as well as to NANCY and  ROJAS.

s.      In or about 1999, NANCY, JAVIER , and ROJAS told a former employee named Tino who had been arrested, deported, and then illegally returned

to the United States, that if he wanted to continue working at LA COSTEÑITA he had to get a false identification with a different name.

     t.    In or about 1999, when G.C.B.S. first started working at LA COSTEÑITA, he told JAVIER that he (G.C.B.S.) was illegally in the United States.

     u.    From or about November 2007 through November 2008, I.F.H. was forced to work as a prostitute by her pimp/padrote at LA COSTEÑITA. I.F.H. advised that conspirator NANCY was the owner of LA COSTEÑITA. If girls wanted jobs as prostitutes at LA COSTEÑITA, they talked to the managers, conspirators YVONNE or CAROLINA. YVONNE or CAROLINA then spoke with NANCY. NANCY made the decision as to whether the girls got hired. If a girl worked at LA COSTEÑITA, she could vouch for another girl to work there and if she did, usually that girl would get hired. ROJAS also hired girls at LA COSTEÑITA and was a friend to many of the pimps. He collected the money earned from the prostitution and controlled and supervised the women inside the brothel. Around September 2009 he stopped going to the bar after he was warned that the police had his picture. He has recently started to come in more often.

     v.    In or about 2010, a minor female, spoke to YVONNE about working at LA COSTEÑITA. She told YVONNE she was seventeen (17) years

15

old but had a false Mexican identification showing her to be twenty (20) years old.
YVONNE told her to go back to the flea market and get an identification showing
her to be two years older so she would not be considered a minor. Whenever the
Mexican women and girls would first start working at LA COSTEÑITA,
YVONNE and CAROLINA would ask them their real age.

      w.    In July 2010, NANCY was told that I.F.H. had two girls who
were sixteen and seventeen years old who wanted to work at LA COSTEÑITA as
prostitutes. NANCY asked I.F.H. if the two girls looked too young. I.F.H. told
NANCY they looked older. NANCY asked I.F.H. if the girls had identification
showing them to be of legal age. I.F.H. told NANCY they did. NANCY then
asked when she could see these two girls. I.F.H. told NANCY both girls were in
the process of being smuggled into the United States. I.F.H. told NANCY both
girls knew they were coming to get in bed with men. NANCY told I.F.H. to bring
the girls to her when they arrived in Houston. NANCY wanted to see them
because if they looked too young she would not employ them. If they looked
older, NANCY would give them a job.

      x.    In August 2010, NANCY told a female, who she believed was
a 17 year old prostitute, that she could work for NANCY because she had an
identification showing she was 21 years old. NANCY told her that she did not

16

want anyone to mention her name if the police showed up at LA COSTEÑITA. NANCY agreed to let her work at LA COSTEÑITA as a prostitute as long as people did not start saying she was too young.

       y.    On January 22, 2011, I.F.H. spoke with YVONNE regarding an underage female who wanted to work at LA COSTEÑITA. YVONNE told her that the girl was too young and probably would not get hired. I.F.H. pointed to two girls in LA COSTEÑITA that I.F.H. knew were minors and asked YVONNE how old those two were. YVONNE responded by telling I.F.H. that those two girls were sixteen (16) and seventeen (17) years old.

       z.    In or about June 2008, G.P.M. was put to work by her pimp as a prostitute at LA COSTEÑITA. NANCY jokingly asked the girls if they were still doing prostitution. The girls told her they were still doing prostitution. If the police came, NANCY told the girls to tell the police they were working as waitresses. If the police asked who the owner was, NANCY told them to say they did not know who the owner was. Between January and May 2009, NANCY told a girl at LA COSTEÑITA to go home because she had bruises and the police were looking for her and her pimp. NANCY said she did not want the police to find this girl in her place of business in a bruised condition.

       aa.    In or about May 2010, YVONNE told NANCY there were

some girls who wanted to work at LA COSTEÑITA who had recently crossed the

border and owed money to a coyote for a smuggling fee.  They needed to work to

pay their smuggling debt.  YVONNE told NANCY about the girls in order to get

her permission for the girls to work at LA COSTEÑITA.

               bb.     In or about January 2009, YVONNE, CAROLINA,

CLAUDIA, and OLVAN, all of whom worked at LA COSTEÑITA, asked I.F.H.,

who had recently been smuggled into the United States, what I.F.H. had to pay to

the coyote who smuggled I.F.H. into the United States.    ALEYDA and CHIVAS,

both of whom worked at LA COSTEÑITA, talked to I.F.H. and to other

employees at LA COSTEÑITA either about their illegal status situation and fear

of getting deported, or their need to go home.  They also asked if anyone knew

who could help get them cross the border on their return trip to the United States.

               cc.     In or about 1999, NANCY and JAVIER caused BLANCA to

smuggle I.L.A. into the United States.  NANCY and JAVIER discussed how many

girls were coming to the United States so they would have the correct amount of

money to pay the smugglers.  NANCY and ROJAS threatened I.L.A. who thought

she was coming to the United States to work as a waitress.  Because of the

pressure placed on her by NANCY and ROJAS, I.L.A. became a prostitute in

order to pay back the smuggling fee to NANCY and ROJAS.  Sometime in 2001,

ROJAS told I.L.A. she had paid her smuggling debt off though she still owed money for clothing, rent, and the like.

In July 2006, CAROLINA, who worked at LA COSTEÑITA, was told that I.L.A. had no papers or legal documents to be in the United States.

Around March 2010, CHIVAS went to a cantina where I.L.A. worked. While there, CHIVAS, who worked at LA COSTEÑITA, told I.L.A. that he was an illegal alien, and that CLAUDIA and OLVAN, who also both worked at LA COSTEÑITA, were illegal aliens as well. OLVAN and CLAUDIA have both been to I.L.A.'s place of employment.

dd.    From in or about 2007 through 2008, E.C.P., worked as a prostitute at LA COSTEÑITA. While working there, NANCY asked E.C.P. how long she had been under the control of her pimp and E.C.P. replied that she had been under his control for two years. NANCY told E.C.P. that working for a man was a waste of time and that it was better for her to work for herself and her family and not for a man. NANCY further advised E.C.P. that if the police showed up, she was to tell them that she worked at LA CUEVA restaurant and not at LA COSTEÑITA.

ee.    From in or about 2007 through 2008, E.C.P. witnessed ROJAS employing Mexican women and girls to work at LA COSTEÑITA as prostitutes.

The Mexican women and girls would go to the bartender asking for work as prostitutes and the bartender would refer them to ROJAS.  ROJAS would either hire them or tell them to come back  and talk to NANCY, the owner.

        ff.    From in or about 2003 through 2005, ROJAS saw E.C.P. with bruises and ROJAS expressed to E.C.P. that he did not understand why girls like her worked for pimps/padrotes and why she and others did not report their abuse to the police.  ROJAS told E.C.P. to leave her pimp because when she is older and worthless to him, he, the pimp, would leave her.  ROJAS told E.C.P. that if she was to come in again with bruises like the ones she had, he would not allow her to work at LA COSTEÑITA.  ROJAS then told E.C.P. that she and the others needed to take taxis to come to work so the police would not suspect anything.  He also told her to tell her pimp to stop hitting her.  Shortly after this conversation, her pimp, EL PIPIS, told E.C.P. that she was a "bitch"  and that she only wanted to go with ROJAS.  EL PIPIS told E.C.P. not to talk to ROJAS anymore or he would continue to beat her.  EL PIPIS further stated that ROJAS was also a pimp and only wanted to take her to bed.

**All in violation of Title 18, United States Code, Sections 1591 and 1594 (c).**

## COUNT TWO
## Conspiracy to Harbor Illegal Aliens
**[Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I),
1324(a)(1)(A)(iii) and 1324(a)(1)(B)(I)]**

32. The introductory allegations as set forth in paragraphs 1 through 19 and the description of the conspiracy's manner and means as set forth in paragraphs 22 through 30 are realleged and incorporated herein.

33. From in or about August 1999 until the date of this indictment, within the Southern District of Texas and elsewhere, the defendants

**MARIA ROJAS aka "NANCY"
JOSE LUIS ROJAS
JAVIER BELMONTES
MADAY MARTINEZ aka "YVONNE"
EVELIN CAROLINA AGUERO
SILVANO SANTOS aka "CHIVAS"
CLAUDIA LNU
OLVAN LNU
ALEYDA LNU and
FRANCISCO LNU aka "PANCHO"**

did knowingly and willfully conspire, confederate and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States, that is:

To knowingly and in reckless disregard of the fact that aliens had come to, entered and remained in the United States in violation of law, attempted to and did conceal, harbor, and shield from detection, such aliens in buildings and other places

in and around Houston, Texas, for purposes of commercial advantage and private

financial gain.

**In violation of Title 8, United States Code, Sections 1324(a)(1)(a)(v)(I), 1324(a)(1)(A)(iii), 1324(a)(1)(B)(I).**

## COUNT THREE
### Illegal Reentry After Deportation
**[Title 8, United States Code, Section §1326(a)]**

On or about February 15, 2011, in the Houston Division of the Southern

District of Texas,

### MARIA ROJAS aka "NANCY"

the defendant herein, an alien who previously had been denied admission, excluded,

deported, and removed from the United States, knowingly and unlawfully was present

in the United States when found in Houston, Texas, without having obtained consent

before March 2003, from the Attorney General of the United States to reapply for

admission into the United States; and without having obtained corresponding consent

after February 2003, from the Secretary of the Department of Homeland Security

pursuant to 6 U.S.C. §§ 202(3) and (4) and 6 U.S.C. § 557.

**In violation of Title 8, United States Code, Section 1326(a).**

## NOTICE OF CRIMINAL FORFEITURE
## (18 U.S.C. § 1594(d))

Pursuant to Title 18 U.S.C. Section 982(a)(6), the United States gives notice to the Defendants,

## MARIA ROJAS aka "NANCY" and
## JOSE LUIS ROJAS,

that in the event of conviction for sex trafficking conspiracy in violation of Title 18 United States Code, Section 1594(c) and 1591, as charged in Count One of the Indictment, the following property shall be forfeited to the United States:

(1) any property, real or personal, that was used or intended to be used to commit or to facilitate the commission of such violations; and

(2) any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

The property subject to forfeiture, includes, but is not limited to, the following property:

1. All money obtained from the conspiracy obtained from the conspiracy charged in Count One of the Indictment, or a money judgment in the same amount.

2. Real property located at 7928 Buchanan Street, Houston, Texas, 77029, and legally described as: Lot 7, in Block "H" of Port Houston Addition, an addition in Houston, Harris County, Texas, according to the map or plat thereof recorded in Volume 2, Page 51, of the map records of Harris County, Texas, including all

improvements, buildings, structures, and appurtenances.

3. Real property located at 8403 Clinton Drive, Houston, Texas 77029, and legally described as: A tract containing 10,740 square feet of land out of Port of Houston Addition, as recorded in Volume 4, Page 45, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

4. Real property located at 8303 Clinton Drive, Houston, Texas 77088, and legally described as: 12,591 sq. ft. out of and being part of Lots 1, 2, 3, 13, 14, 15 in Block 86 of Port Houston Addition, an Addition to the City of Houston, N.S.B.B., Harris County, Texas, according to the map or plat thereof recorded in the Office of the County Clerk of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

5. Real property located at 8221 Clinton Drive, Houston, Texas 77029, and legally described as: Parts of Lots 15 and 16, in Block 84 and Part of Lots, 1, 2, 3, 4, and 13, in Block 84-A and a Tract of Land out of Taft Street, Port Houston, recorded in Volume 4, Page 45, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

6. Real property located at 8037 Clinton Drive, Houston, Texas 77029, and legally described as Tracts 2B, 3B, 4B, 4A, 5A, 19B, 20B, 20A, and 21A of the Port of Houston NS as recorded in the property records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

7. Real property located at 813 Defender Street, Houston, Texas 77029, and legally described as: Lot 4, in Block 24, of Clinton Park Addition, an addition in Harris County, Texas, according to the map or plat thereof recorded in Volume 18, Page 28, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

8. Real property located at 1021 Defender Street, Houston, Texas 77029, and legally described as: Lot 17, in Block 24 of Clinton Park Addition, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 18, Page 28, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

9. Real property located at 7902 Mendez Street, Houston, Texas 77029, and legally described as: Lot 1, Block 24 of Port Houston Addition, an addition in Harris County, Texas, according to the map or plat thereof recorded in Volume 2, Page 51, of the deed records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

10. Real property located at 2327 McCarty Street, Houston, Texas 77029, and legally described as Lot 16, Block 75, Port Houston Addition, N.S.B.B., according to the map or plat of said subdivision of the John Brown League Survey now on file with the County Clerk of Harris County, Texas, map records Volume 2, Page 51, including all improvements, buildings, structures, and appurtenances.

A Defendant may be jointly and severally liable to the United States with any co-defendant convicted of a common count.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(6), 8 U.S.C. §1324(b), and 28 U.S.C. § 2461)

Pursuant to Title 18 U.S.C. Section 982(a)(6), the United States gives notice to the Defendants,

**MARIA ROJAS aka "NANCY"**
**JOSE LUIS ROJAS**
**JAVIER BELMONTES**
**MADAY MARTINEZ aka "YVONNE"**
**EVELIN CAROLINA AGUERO**
**SILVANO SANTOS aka "CHIVAS"**
**CLAUDIA LNU**
**OLVAN LNU**
**ALEYDA LNU and**
**FRANCISCO LNU aka "PANCHO",**

that in the event of conviction for conspiracy to harbor an undocumented alien in violation of Title 8, United States Code, Section 1324(a)(1)(B)(iii) and Title 8, United States Code, 1324(a)(1)(A)(v)(I), as charged in Count Two of the Indictment, the following property shall be forfeited to the United States:

(i) any conveyance, including any vehicle, used in the commission of the offense, and any property traceable to such conveyance;

(ii) any property that constitutes, or is derived from, or is traceable to gross proceeds obtained directly or indirectly from the commission of the offense; or

(iii) any property that is used to facilitate, or is intended to be used to facilitate, the commission of the offense.

The property subject to forfeiture, includes, but is not limited to, the following property:

1. All money obtained from the conspiracy charged in Count Two of the Indictment, or a money judgment equal to the same amount.

2. Real property located at 7928 Buchanan Street, Houston, Texas, 77029, and legally described as: Lot 7, in Block "H" of Port Houston Addition, an addition in Houston, Harris County, Texas, according to the map or plat thereof recorded in Volume 2, Page 51, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

3. Real property located at 8403 Clinton Drive, Houston, Texas 77029, and legally described as: A tract containing 10,740 square feet of land out of Port of Houston Addition, as recorded in Volume 4, Page 45, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

4. Real property located at 8303 Clinton Drive, Houston, Texas 77088, and legally described as: 12,591 sq. ft. out of and being part of Lots 1, 2, 3, 13, 14, 15 in Block 86 of Port Houston Addition, an Addition to the City of Houston, N.S.B.B., Harris County, Texas, according to the map or plat thereof recorded in the Office of the County Clerk of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

5. Real property located at 8221 Clinton Drive, Houston, Texas 77029, and

legally described as: Parts of Lots 15 and 16, in Block 84 and Part of Lots, 1, 2, 3, 4, and 13, in Block 84-A and a Tract of Land out of Taft Street, Port Houston, recorded in Volume 4, Page 45, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

6. Real property located at 8037 Clinton Drive, Houston, Texas 77029, and legally described as Tracts 2B, 3B, 4B, 4A, 5A, 19B, 20B, 20A, and 21A of the Port of Houston NS as recorded in the property records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

7. Real property located at 813 Defender Street, Houston, Texas 77029, and legally described as: Lot 4, in Block 24, of Clinton Park Addition, an addition in Harris County, Texas, according to the map or plat thereof recorded in Volume 18, Page 28, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

8. Real property located at 1021 Defender Street, Houston, Texas 77029, and legally described as: Lot 17, in Block 24 of Clinton Park Addition, a subdivision in Harris County, Texas, according to the map or plat thereof, recorded in Volume 18, Page 28, of the map records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

9. Real property located at 7902 Mendez Street, Houston, Texas 77029, and legally described as: Lot 1, Block 24 of Port Houston Addition, an addition in Harris

County, Texas, according to the map or plat thereof recorded in Volume 2, Page 51, of the deed records of Harris County, Texas, including all improvements, buildings, structures, and appurtenances.

10. Real property located at 2327 McCarty Street, Houston, Texas 77029, and legally described as Lot 16, Block 75, Port Houston Addition, N.S.B.B., according to the map or plat of said subdivision of the John Brown League Survey now on file with the County Clerk of Harris County, Texas, map records Volume 2, Page 51, including all improvements, buildings, structures, and appurtenances.

A Defendant may be jointly and severally liable to the United States with any co-defendant convicted of a common count.

## SUBSTITUTE ASSETS

In the event that the property subject to forfeiture as a result of any act or omission of the defendant:

a.  cannot be located upon exercise of due diligence;

b.  has been placed beyond the jurisdiction of the Court;

c.  has been transferred or sold to, or deposited with a third party;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek forfeiture of any other property of the

defendants up to the value of such property pursuant to Title 21, United States Code,

Section 853(p), incorporated by reference in Title 18, United States Codes, Section

982(b)(1), and in Title 28, United States Code, Section 2461.

                              A TRUE BILL:

                                Original Signature on File

                         FOREPERSON OF THE GRAND JURY


        JOSE ANGEL MORENO
        UNITED STATES ATTORNEY
By:

        RUBEN R. PEREZ
        ASSISTANT UNITED STATES ATTORNEY

        JOSEPH C. MAGLIOLO
        ASSISTANT UNITED STATES ATTORNEY