THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

*  *  *  *  *

UNITED STATES OF AMERICA        *    CRIMINAL NO. H-11-116
                                *
Versus                          *    Houston, Texas
                                *    2:05 p.m. - 3:25 p.m.
MARIA ROJAS and                 *
JOSE LUIS ROJAS                 *    April 9, 2012

*  *  *  *  *

**SENTENCING**

BEFORE THE HONORABLE LYNN N. HUGHES
UNITED STATES DISTRICT JUDGE

*  *  *  *  *

**THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE
UNDER THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS
AUTHORIZED BY COURT ORDER.   UNAUTHORIZED REPRODUCTION
WILL RESULT IN AN ASSESSMENT AGAINST COUNSEL FOR THE
COST OF AN ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
    General Order 94-15, United States
    District Court, Southern District of Texas**

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*Edward L. Reed*
United States Court Reporter
515 Rusk, Suite 8016
Houston, Texas 77002 * 713-250-5594

**APPEARANCES:**

For the United States of America:

    MR. RUBEN R. PEREZ
    MR. JOSEPH MAGLIOLO
    MS. KATHERINE L. HADEN
    United States Attorney's Office
    1000 Louisiana, Suite 2300
    Houston, Texas 77002

For Defendant, Maria Rojas:

    MR. DAVID B. ADLER
    Attorney at Law
    6750 West Loop South
    Suite 120
    Bellaire, Texas 77401

For Defendant, Jose Luis Rojas:

    MR. MARK W. BENNETT
    Bennett & Bennett
    735 Oxford Street
    Houston, Texas 77007

Interpreter:

    Yes

Court Reporter:

    EDWARD L. REED
    515 Rusk, Suite 8016
    Houston, Texas 77002

1                   **P R O C E E D I N G S**

2               **April 9, 2012 – 2:05 p.m.**

3       THE COURT: *United States of America versus*

4 *Maria Rojas and Jose Luis Rojas.*

5       MR. PEREZ: Good afternoon, Your Honor. Ruben

6 Perez, Joe Magliolo, and Katherine Haden for the United

7 States.

8       MR. ADLER: David Adler for Maria Rojas, Your

9 Honor.

10       MR. BENNETT: Mark Bennett for Jose Luis Rojas,

11 Your Honor. Good afternoon.

12       THE COURT: Good afternoon.

13       Would you raise your right hand, please.

14 Do you solemnly swear the testimony you give will be the

15 truth, the whole truth, and nothing but the truth?

16       Mr. Rojas?

17       DEFENDANT JOSE ROJAS: I do.

18       THE COURT: Ms. Rojas?

19       DEFENDANT MARIA ROJAS: Yes.

20       THE COURT: You may put your hand down.

21       Mr. Perez, are you going to start off for

22 the Government?

23       MR. PEREZ: I can if the Court wants me to,

24 Your Honor.

25       THE COURT: Okay. Do you have some objections?

```
 1        MR. PEREZ:  No objections to the Presentence

 2  Report, Your Honor.

 3        THE COURT:  And do you actually have a

 4  recommendation for Ms. Rojas?

 5        MR. PEREZ:  We have one for both Ms. Rojas and

 6  Mr. Rojas.

 7        THE COURT:  What is it?

 8        MR. PEREZ:  20 years, Your Honor, imprisonment

 9  for each respective defendant.

10        THE COURT:  Mr. Adler, would you like to

11  discuss some of the points?

12        MR. ADLER:  If I may, Judge, briefly.

13             I would argue to the Court that a sentence

14  of no more than 108 months to 135 months accomplishes

15  all of the goals of the 3553.  Under the Guidelines, her

16  range is life, which I appreciate the Government has

17  recognized is inappropriate.  But I think the 20-year

18  sentence that they have sort of plucked out of the range

19  is also more than sufficient to meet the sentencing

20  objectives.

21             Ms. Rojas ran a bar and a restaurant and

22  there were prostitutes there.  I realize the Government

23  has designs on a big press release about this case when

24  we're done here today, but I just want to point out some

25  of the things that will probably not be in that press
```

release. The press release will talk a lot about
under-aged women held against their will, but the
evidence in this case showed from the depositions we
took of some of these women that they were not under
age, many of them. Those that were under age admitted
to having used false identification showing they were
above the age of 18 and they were taking taxis back and
forth from their apartments to the club to work.

So I think the Government understandably
is trying to paint a picture that is not accurate and
doesn't justify a 20-year sentence. Ms. Rojas knew she
was running a bar, clearly. She knew that there were
illegal aliens there working and she knew they were
working as prostitutes, and she should be sentenced
based on that activity, not the idea that she was
imprisoning young girls against their will to work as
prostitutes.

THE COURT: Just one clarification. This was
not a hotel bar where there happened to be prostitutes.

MR. ADLER: It was not.

THE COURT: It was a structurally and
managerially operated brothel.

MR. ADLER: Judge, it was a bar that had an
adjacent structure that was the brothel, yes.

THE COURT: Whether there was an atrium or a

1   terrace or something --

2         MR. ADLER:  Well, I thought the Court was

3   asking me if it was strictly a brothel, but there was a

4   bar.

5         THE COURT:  No, no, most brothels have piano

6   players, so I've read.  But it was a bar, a brothel, and

7   for all I know, there was gambling going on.  And I just

8   want to make it clear that this was not an instance that

9   does happen where somebody is running a legitimate bar

10  and people are routinely taking bets there on sports

11  events, or there are working women or men who are

12  engaging in commercial sex at that location.  That

13  happens to legitimate places from Conoco stations on up

14  or down.  This was -- had as an integral substantial

15  purpose a brothel; right?

16        MR. ADLER:  Yes, sir.

17        THE COURT:  And I'm not trying to be unduly

18  harsh.  I think that's an important distinction.

19              Mr. Bennett?

20        MR. BENNETT:  Your Honor, to what Mr. Adler has

21  said, I would add that Mr. Rojas is the maintenance man

22  at the brothel, whom the Government has cast in a

23  managerial role that he, in fact, didn't take.  I know

24  the Court has read my objections to the Presentence

25  Investigation Report.  Seldom do I find that it avails

me anything to add anything orally at argument. But

I've learned that Ms. Rojas, if she were allowed and

inclined to answer the question, would probably agree,

and I've just learned this today, would probably agree

that Mr. Rojas was just a maintenance guy, he's not

managerial material, Your Honor.

THE COURT: It is the case that they are

related. And that, in itself, is not incriminating.

Knowing my brother, I hope so. But it can be indicative

of a significant trust for observation, reporting, and

even an occasional problem solving or problem referral

by Mr. Rojas in her absence.

MR. BENNETT: That situation is not

inconceivable. Given the psychological report in this

case, however, it doesn't appear that Mr. Rojas was the

sort of manager, leader, organizer at least that the

Guidelines would contemplate. There may have been a

time when he was left at the bar and said, okay, if this

happens, then call me, or if this happens, do that.

THE COURT: And that's what I was suggesting.

If somebody saw a problem, they would probably tell him

and he'd call her.

MR. BENNETT: And maybe so. There might have

been a perception on the part of some of the people that

worked there that he had more of a role than he did,

1  just as there is in the eyes of the Government, because

2  he's her brother rather than some schmo from the street.

3              It is also true, Your Honor, that one of

4  the people whom the Probation Department pegged as a

5  manager was allowed to plead to a harboring illegal

6  aliens count and was sentenced to 11 months.

7          THE COURT:  Probably some liberal judge.

8          MR. BENNETT:  They keep coming up.

9          THE COURT:  Do you want to continue with the

10  lead?

11          MR. PEREZ:  Judge, if we were interested in a

12  press release -- and I don't know if that dignifies a

13  response.

14          THE COURT:  I don't want to talk about the

15  press release unless you're going to use an ugly picture

16  of me in it.

17              Here's some questions I have?

18              The wage and hour schedules, obviously a

19  reconstruction.

20          MR. PEREZ:  Done by the Department of Labor,

21  Your Honor.

22          THE COURT:  Who knew nothing about anything,

23  except maybe talked to some of the people after they

24  were arrested.

25          MR. PEREZ:  And based on some reports as well,

1  Your Honor.

2  THE COURT:  And as I understand it -- and

3  correct me -- I do not believe I've heard anyone testify

4  that she was held against her will.

5  MR. PEREZ:  Okay, Your Honor, we do have -- we

6  would proffer to the Court, based on the information in

7  the PSR and the information gathered by the agents, when

8  this operation initially started, Your Honor, they did

9  smuggle some women into the United States.  Part of the

10  program was for them to work at the bar.  And if they

11  got out of line, there would be some retribution to the

12  family members back in their home country.

13  Well, they kind of got smart.  They said:

14  This is too much trouble keeping track of these women

15  here at the bar.  They leave, some people leave without

16  paying us.  What we'll do now is switch gears and let

17  the pimps or the padrones --

18  THE COURT:  I'm sorry?

19  MR. PEREZ:  That's a Mexican pimp.

20  P-a-d-r-o-n-e-s, the pimps.

21  THE COURT:  I don't plan to have any use for

22  it, but just curious.

23  MR. PEREZ:  In this line of work, you learn so

24  many different terms, Your Honor.  At any rate, the

25  Mexican pimps were then the way that they were able to

1 keep a supply of women at the bar. That way, the pimps

2 could keep them in control, bring them to work, so in

3 that way they wouldn't have the hassle with keeping them

4 under control.

5        We have evidence to show, Your Honor, not

6 only in the reports, but I think the PSR would show that

7 many times the pimps would get out of hand with the

8 women. Some of the customers would then try to

9 interfere on behalf of the women and these people would

10 say, leave them alone, that's their women, that's their

11 pimps, so they were aware of the women being forced to

12 work at the bars.

13      THE COURT: This could be a long discussion and

14 could be largely philosophical. So what you're saying

15 is Ms. Rojas subcontracted the prostitution side of her

16 operation to other contractors?

17      MR. PEREZ: Part of it, part of it.

18      MR. MAGLIOLO: The enforcement part of it, Your

19 Honor, the making sure the girls were there and working

20 and the management of the girls was subcontracted to the

21 pimps in the second half of the organization. It would

22 be, I think, naive at best to think that all the girls

23 that worked there -- the adults, not talking about the

24 minors yet, all wanted to work in the manner and at the

25 time with the means that they did work. I think it's

1  pretty much general knowledge --

2        THE COURT:  But your client's laws made it

3  impossible for them to get legitimate jobs and avoid

4  these kind of underworld jobs.

5        MR. MAGLIOLO:  Well, some of them were brought

6  here for other -- thinking they were going to be doing

7  other things than being a prostitute, Your Honor.  Not

8  all.  In fairness, some of the women working there went

9  to work as prostitutes, knew they were going to be

10  prostitutes, wanted to be prostitutes.  But there were

11  others who were brought to the United States to do

12  something other than be prostitutes.  They thought they

13  were going to work as maids, work as waitresses, and

14  this was to pay off their smuggling fees.  Then they get

15  here and they are told:  You are going to be a

16  prostitute, you're going to be a prostitute here, or

17  something is going to happen to you and/or your family

18  back home.

19         So it was truly a mixture of voluntary

20  prostitutes, some that were not so voluntary, and the

21  minors then who obviously don't have the capability of

22  making that decision.

23        THE COURT:  But if the minors have lied about

24  their age reliably, that is some indication?

25        MR. MAGLIOLO:  That's not true, Your Honor.

1  That's absolutely not true.  What's true is these

2  defendants talked to the minors, recognized them as

3  being minors, and did not care whether they were minors

4  or not.  What the reports will reflect -- and we have

5  some quotes if the Court would like to hear them, but

6  the reports reflect that they were only concerned about

7  how young they looked, because if they looked really

8  young, then they could get in trouble.

9           In fact, one conversation they said:

10  Look, we'll give you a chance as long as it doesn't draw

11  attention.  But you have to get an ID.

12           MR. PEREZ:  Fake ID?

13           MR. MAGLIOLO:  A fake ID.  And these

14  defendants, along with their help at the bar, the ones

15  that facilitated these people getting fake IDs, most of

16  them didn't know enough -- they don't speak English,

17  didn't know enough, how to get a fake ID and where to

18  get a fake ID.  It was these defendant's --

19           THE COURT:  You can only speak Armenian and by

20  4:00 this afternoon you could have a fake ID in Spanish

21  saying you were an Argentine citizen.

22           MR. MAGLIOLO:  Based on -- what the girls'

23  statements are is they did not know where to go to get

24  fake IDs.  All they knew was if they wanted to work

25  there, the management said they had to have fake IDs.

1  The management then got somebody that worked there.

2  They're the ones that took the girls and got them to get

3  fake IDs.  It was not the fact that they were young that

4  concerned these defendants.  It was only how they looked

5  because they didn't want to get in trouble.  And we have

6  the quotes from the witnesses to show that to the Court.

7       THE COURT:  Two wrongs don't make a right, I

8  understand, but it is the case that nearly everybody

9  working there was working there in connection with

10  violating American labor laws or American immigration

11  laws.

12       MR. MAGLIOLO:  Certainly part of it, because

13  many of them are working off a debt from being smuggled

14  there is what they are doing, and they are trying to

15  work their debt off, the smuggling debt.  Again, in the

16  beginning the smuggling debt was to them because they

17  smuggled them in.  Later, when they became

18  subcontractors, then that was just between the smuggler,

19  the pimp, and the prostitute.

20       MR. ADLER:  Judge, just to balance the picture

21  a little bit, there were instances where some of the

22  prostitutes were caught and deported back to Mexico and

23  came right back into the United States again.  Two

24  wrongs don't make a right.  They went right back to work

25  at the same bar.

1          THE COURT:  It's three wrongs or four, I guess,

2    if you go right back to work.

3          MR. PEREZ:  Judge, under the law -- I know

4    we're talking practically, but under the law, we don't

5    even have to prove that they knew that those minors were

6    minors.

7          THE COURT:  No, I understand.  It's adults I

8    can't stand.  Children I have some concern for.

9    Especially old lawyer adults.

10              But I'm talking about -- we use some of

11   these adults -- you come, you work as a prostitute to

12   pay off your fee, you get deported before you do it or

13   after you do it.  You come back and do the same thing

14   again, you're not a victim.

15          MR. MAGLIOLO:  And there were some of those,

16   Your Honor, no question.  That made up maybe a quarter

17   to even let's say half of the girls may have been in

18   that situation.  But there was another group that were

19   forced into it and then there was again the minor group.

20          THE COURT:  Forced because they owed money?

21          MR. MAGLIOLO:  Yes, they owed money, but they

22   could have worked that off in many other ways other than

23   being a prostitute, Your Honor.  Many of the girls

24   didn't want to be prostitutes.  They thought they were

25   going to be a waitress, they thought --

1          THE COURT:  Then why didn't they become other

2    things?

3          MR. MAGLIOLO:  Because the pimps said, you do

4    what we want, where we want, or we'll hurt you or hurt

5    your family.  That's the reason.

6          THE COURT:  And none of the girls, during this

7    time, left and found alternative -- or just disappeared?

8          MR. MAGLIOLO:  No, they did, Your Honor.  That

9    was the problem with them initially.  When they were

10   smuggling the girls in, some of the girls would leave.

11   Some of them would run off owing debts and that's why

12   they switched gears and went to the second system, that

13   is not bringing the girls, but letting the pimps supply

14   the girls, so they wouldn't have to worry about the

15   girls.  Then the pimps were the ones that had to worry

16   about whether the girls left or not.

17         THE COURT:  In all of the data that has been

18   reconstructed, there is no example of women, paid or

19   unpaid, escaping into the rest of America?

20         MR. MAGLIOLO:  There were, they did.

21         THE COURT:  So some women came to work for a

22   while that either paid off their debt or left?

23         MR. MAGLIOLO:  Yes, Your Honor.  That's why I'm

24   saying there are three major categories.

25         THE COURT:  The minors are -- obviously, there

1  is some difficulty for people with determining who's a

2  minor.

3          MR. MAGLIOLO:  But not for them, Your Honor.

4  The evidence is clear that they had conversations -- the

5  minors had conversations in the presence of both these

6  defendants indicating these minors and these defendants

7  played an active role, and understanding they were

8  minors, deciding whether to hire them as minors and

9  getting them the IDs so they would appear to be older.

10 Again, we have quotes from -- we would be happy to read

11 quotes from the offense reports, from the debriefing of

12 the minors, from the debriefing of the other girls as to

13 that.

14          And I just might add, to say that

15 Mr. Rojas was only the maintenance man, that's just --

16 borders on just untruthfulness, Your Honor.  If he's

17 just a maintenance man, he never should have pled guilty

18 to this offense in the first place.  But all evidence is

19 he was a co-partner and co-equal with his sister.

20          MR. PEREZ:  Your Honor, I think what's really

21 important is, when the Court says they could have left,

22 you've got to understand, Your Honor, if it please the

23 Court, many times what the pimps would do is say, look,

24 you better not escape.  Number one, I'm going to beat

25 the heck out of you.  And if you do escape, remember, I

know where your family is back home.  Bad things are
going happen to your kids, bad things are going to
happen to your parents, to your siblings.  Bad things
may happen.  You better do what I say.

THE COURT:  It's like being a lawyer for the
mob.  It's lifetime employment.

MR. MAGLIOLO:  I thought you were saying lawyer
for the U.S. Attorney's Office.

THE COURT:  Because the minute you want to
quit being a lawyer for the mob, your life's over.
I understand, but that's not everybody.

MR. MAGLIOLO:  Correct.

MR. PEREZ:  We understand that.

THE COURT:  There are girls who show up wanting
to come to America and the coyotes don't know where they
came from.  I'm just trying to make it clear, in no way
justifying it, that it is more complicated than it might
look on television.

MR. MAGLIOLO:  Yes, Your Honor.

THE COURT:  In one of these scenarios?

MR. MAGLIOLO:  Remember what Mr. Perez says.
Again, we have the report to document it, on more than
one occasion the pimps would get a little rough with the
girls there in the restaurant, rough enough that the
customers who -- believe it or not, customers who were

there for entertainment in the form of prostitution,
many of those customers don't want to be with a woman
who's being forced.  And the customers would start to
stand up and get inbetween the pimps and the woman when
they were getting rough, and the witnesses -- it's in
the statement, witnesses said -- particularly, I
believe, as to --

MR. PEREZ:  Both of them.

MR. MAGLIOLO:  -- both of them, they would say
no, leave them alone, that's their business.

THE COURT:  Actually, the sociological evidence
is that jobs are much more considerate of prostitutes
than anybody else -- police officers, pimps, anybody
else.

MR. MAGLIOLO:  Believe it or not, in reading
all this, we've been talking to the girls -- because
obviously, if you talk to them in their language -- in
fact, we've had them actually come forward and say,
look, we'll testify, we'll do whatever is necessary
because, again, we're not here to be with women who are
being forced to engage in this conduct.

THE COURT:  And most men, despite what
sometimes you might read in the paper, don't like to see
women beat up, period.

MR. PEREZ:  Judge, not necessarily in this

1  case, but in other --

2  THE COURT:  Unless they are lawyers.

3  MR. PEREZ:  In other cases we've had, some of

4  our intel, some of our cases are made from the

5  intelligence we gather, Judge, just to underscore what

6  the Court just said.

7  THE COURT:  All right, Mr. Adler, do you want

8  to -- do you have anything to say to the accounting?

9  MR. ADLER:  Yeah, Judge, I did have an

10  objection to that, that there is really no -- I don't

11  believe the Court has sufficient evidence to say that

12  this is accurate by a preponderance of the evidence.  It

13  doesn't include times that these girls were deported,

14  not working before they came back.  It doesn't include

15  days off.  There is really no indicia of reliability.

16  And I would point out that some of the numbers involved

17  are just ridiculous, with all respect to the Government

18  employee who calculated that.  Really no difference than

19  the Government's claim that my client amassed $5 million

20  in assets they are trying to forfeit.  These kind of

21  numbers are just astronomical in the circumstances, in

22  the cases, are just not accurate.

23  MR. PEREZ:  That's not correct, Your Honor.  We

24  have not asked for the $5 million forfeiture.

25  THE COURT:  I think this is helpful, but I did

1  find that the assumptions -- and they are assumptions --

2  are significantly unrealistic. That the gross numbers

3  may actually be low on here is something else. But that

4  everybody worked 11 hours a day, six days a week is just

5  unrealistic. And apparently they were paid. So they

6  are not under the Fair Labor Standards Act. But it was

7  not slavery. It was substandard wages; right?

8         MR. PEREZ: Your Honor, it sounds unrealistic,

9  Your Honor, but it is realistic.

10         MR. MAGLIOLO: And the girls weren't paid. The

11  pimps were paid and then the girls were given a little

12  just pittance.

13         THE COURT: But they owed the pimps?

14         MR. MAGLIOLO: The pimps are paid, not the

15  girls. The pimps are paid and the pimps give the girls

16  a pittance.

17         THE COURT: The girls are there working for the

18  most part because they owe somebody a debt.

19         MR. PEREZ: Sometimes, Your Honor, but that's

20  not the way it happened. Sometimes they were just pimps

21  who --

22         THE COURT: What do you think the ratio for a

23  hundred dollar trick, what is the decision of the gross?

24         MR. PEREZ: It was, let's say, $65, Your Honor.

25  The bar would keep 15 and the girls would keep 50. $50.

1    MR. MAGLIOLO:  On a $65 experience, Your Honor.

2    THE COURT:  They are called tricks.

3    MR. MAGLIOLO:  Yes, Your Honor.

4    THE COURT:  So the 15 goes for labor cost and

5 50 for overhead?

6    MR. MAGLIOLO:  And the bar would supply the

7 condom and a paper towel, Your Honor.

8    THE COURT:  And a room.

9    MR. MAGLIOLO:  And a room for their $15.  But

10 the room was very limited in time.  I forget, like 15

11 minutes.

12    MR. PEREZ:  15 minutes.

13    MR. MAGLIOLO:  15 minutes, or you had to pay

14 for the next slot.

15    MR. BENNETT:  Your Honor, I think that what the

16 Government is saying is $15 overhead and $50 labor.  $50

17 to the girl and 15 to the house; right?

18    MR. MAGLIOLO:  Yes.

19    MR. ADLER:  Or to the defendants.

20    THE COURT:  So 50 labor and 15 overhead?

21    MR. ADLER:  Correct, 15 to the bar, 15.

22    THE COURT:  I'm sorry, I had it backwards.

23    MR. MAGLIOLO:  Out of 15 came the condom, the

24 overhead, the room, and the one paper towel they gave.

25         Of course, they had the drink sales on

1  top of -- the bar had the drink sales on the guys to get

2  them ready.  We're talking about what this was, it was

3  really, I think, a bordello that served drinks, as

4  opposed to a bar that allowed prostitution, Your Honor.

5          THE COURT:  So would that be like professional

6  sports where the bar supports the event going on nearby

7  rather than a sports event with refreshments?

8          MR. MAGLIOLO:  The Government doesn't know how

9  to respond to that.

10          THE COURT:  If you make $50 for a trick, where

11  do we get the $5.15 an hour rate on this chart?

12          MR. MAGLIOLO:  I understand that to be just the

13  rate there -- I'd have to look at it again, but is that

14  the rate that --

15          *[Document tendered to Mr. Magliolo.]*

16              I think that's just the hourly rate that

17  the Department of Labor worked from, Your Honor, is what

18  I believe.

19          THE COURT:  Okay.  But then there is not going

20  to be any -- if they worked --

21          MR. MAGLIOLO:  I don't think the Department of

22  Labor figures in specifically an hourly rate for

23  prostitutes.  I think they just figure an hourly rate

24  for non-professional employees, Your Honor.  I believe

25  that's how it was explained to me, but it's been a

1  while.

2      THE COURT:  But if you did three tricks in an

3  11-hour day, that's $150.  That's way above minimum

4  wage.

5          Let's take a 10 minutes recess.

6      *[Recess]*

7      THE COURT:  Yes, sir?

8      MR. MAGLIOLO:  Your Honor, if you could

9  accommodate us just like five minutes, we would like to

10 put in some brief quotes from the witnesses, what they

11 would testify specifically as to these defendants'

12 conduct and this argument that they didn't know what was

13 going on, just brief comments, five minutes, and the

14 Court can really get a feel of what the testimony will

15 have been from the witnesses.

16     MR. ADLER:  We never contested we didn't know

17 what was going on.

18     THE COURT:  I can believe you.  I want to go

19 back to the -- you're just trying to avoid the

20 spreadsheet.

21     MR. MAGLIOLO:  Yes, we are, Your Honor.

22     THE COURT:  Mr. Magliolo, nobody runs an

23 operation with a parking lot, lots of traffic, gates --

24     MR. MAGLIOLO:  They had deer stands up with

25 their guards and watchers and those on top of it in the

1  parking lot, Your Honor.

2          THE COURT:  Is there much deer out there all in

3  the ship channel?

4                  And had brothel accommodations and beer.

5  It's perfectly clear it was an operation.

6          MR. MAGLIOLO:  Thank you, Your Honor.

7          THE COURT:  But this chart, I don't think is

8  very helpful.  I mean, I understand that there is a

9  large volume of stuff.  It involves a minuscule number

10  of the women and it doesn't differentiate between those

11  who were compelled against their will, those -- this

12  woman was compelled against her will for six years.

13  That seems implausible.  Somewhere by the year three or

14  four she would realize she could make a break for it.

15                  But it reminds me of I had some testimony

16  from a Government chemist that the water in the ship's

17  tanks and the water in the shore tank were exactly the

18  same; and therefore, you could tell that the ship was

19  going to dump the water at sea without a permit.  And

20  spectrographically, it had been examined and been

21  exactly the same plus or minus 40 percent.

22                  I acquitted them.

23                  These are numbers that could be true.

24  It's too small a sample of the total number of girls.

25  It is full of assumptions, some of which seem highly

1 │ implausible.  But my knowledge is something less than

2 │ limited.

3 │             That it was a big operation is not a

4 │ question.

5 │        MR. MAGLIOLO:  And, Your Honor, as to how long

6 │ the girls would stay in bondage, we live in a little bit

7 │ different world than these people live in.  Now, you

8 │ hear about the Stockholm Syndrome.  At a certain point

9 │ in time it's been our experience that after being

10 │ threatened, beaten, families threatened, and if

11 │ something were to happen -- I don't recall if it was

12 │ this case in particular -- a home would burn down in the

13 │ village they were from.  And even if the pimps didn't do

14 │ it, they would intimate to the girls that that was

15 │ so-and-so who didn't cooperate.  And these people have

16 │ limited education and at some point in time they fall

17 │ into line because it's just not worth it not to be.

18 │        THE COURT:  And also because American law

19 │ prevents them from doing a lot of other things.  They

20 │ could have gone to the nearest police station.

21 │        MR. MAGLIOLO:  That is so foreign to their

22 │ understanding, because if they went to the nearest

23 │ police station at home, they would have to pay -- they

24 │ would either get beaten or have to pay them, too.  So

25 │ they don't have the concept of our sense of justice.

1      THE COURT:  Six years in America --

2      MR. MAGLIOLO:  They are in America, Your Honor,

3  but they are at the brothel, their home, and maybe if

4  they are lucky, they get to go to K-Mart or Target

5  escorted, Your Honor.

6      THE COURT:  They are living in America, they

7  see what other people do.

8      MR. MAGLIOLO:  They don't, Your Honor.  They

9  really don't.

10      THE COURT:  And I'm not trying to minimize it.

11  It's just not quite as simple as some of the data.

12      MR. PEREZ:  Judge, another thing, this was all

13  a smuggling debt situation.

14      THE COURT:  That's not the reason we're here.

15      MR. PEREZ:  Oh, no, we're here because --

16      THE COURT:  Without the women being smuggled, I

17  have no jurisdiction over prostitution whatsoever.  This

18  case is entirely about an operation that smuggled women

19  to use as prostitutes for whatever purpose, whether to

20  pay off their coyote bill or to send money home.

21  Otherwise, this belongs across the street.

22      MR. MAGLIOLO:  Your Honor, if it wasn't the

23  forced fraud or coercion to get the girls to work and

24  the minors involved, we would not be here.  That's what

25  really makes this --

1    THE COURT:  No, but the implication.

2    MR. MAGLIOLO:  Not really, Your Honor.

3    THE COURT:  There is no federal jurisdiction

4 over beating up prostitutes.

5    MR. MAGLIOLO:  I believe there is, Your Honor.

6    THE COURT:  You show me in my little

7 Constitution, which I have now handy, federal

8 jurisdiction over beating up prostitutes.

9    MR. MAGLIOLO:  It would be the commerce clause,

10 Your Honor.

11    THE COURT:  Something like the Mann Act.

12        In the passage of the Mann Act, which for

13 of those of you who don't know, makes it a federal crime

14 to transport a woman in interstate commerce for immoral

15 purposes, the Supreme Court's analogy was that young

16 girls are to passenger cars as diseased cattle are to

17 cattle cars on interstate railroads, a lovely and

18 delicate analogy if there ever was one, and false.

19 Absolutely false.  The cattle are contagious.  The girl

20 leaving Logansport, Kansas for Chicago is not

21 contagious.

22    MR. MAGLIOLO:  Either way, it's uncontroverted

23 that the girls did come --

24    THE COURT:  These girls were imported.

25    MR. ADLER:  We don't dispute that, Judge.  The

1   Government let some of the defendants in this case plead

2   to the trafficking and we tried to do the same, but the

3   Government refused.  So we don't dispute that.

4           MR. PEREZ:  For good reason, we did what we

5   did, Your Honor.

6           THE COURT:  But all of the offenses are still

7   federal offenses, which involve importation and

8   trafficking in imported people.  That was my point.

9           MR. MAGLIOLO:  Yes, Your Honor.

10          THE COURT:  I am not in a position to express

11  general approval or disapproval of prostitution or bars

12  or enforcers or any of that stuff.  It happens to be a

13  federal crime to import people to be prostitutes.  It's

14  actually on your citizenship application, in case you

15  ever wondered about that.  One of the questions you have

16  to answer, after your final interview and before I can

17  give you the oath, is if you imported any prostitutes.

18  Seems a little peculiar to me, but they didn't ask.

19          All right.  Ms. Rojas, do you have

20  anything to say before I sentence you?

21          DEFENDANT MARIA ROJAS:  I want to say that I'm

22  truly sorry.  I know that this was an offense, what I

23  did.  But I didn't bring any of these girls.  They came

24  of their own free will to the bar.  And I don't really

25  know how I got into this problem.

1    THE COURT:  You got up one morning and you

2  hired girls who were working off their importation fees

3  as prostitutes?

4    DEFENDANT MARIA ROJAS:  No, I didn't hire any

5  girls and I didn't know --

6    THE COURT:  No, ma'am, everybody just showed up

7  out there and served drinks and guarded the place and

8  cleaned the rooms and slept with men and charged money.

9  Just it all happened while you were busy watching

10  television.

11    You have a couple of times earlier tried

12  to minimize your responsibility.  And I am perfectly

13  willing, if you would like to minimize your

14  responsibilities further, we could just have a trial and

15  you can explain exactly what you did, your lawyer can

16  examine you, the defense will have to -- the Government

17  will have to put up its exhibits and things.  But you

18  have sworn to me that you knew what you were doing and

19  you were smuggling women for the purposes of

20  prostitution.

21    MR. ADLER:  If I could, Judge, we had this

22  bump in the road at the rearraignment also, and what

23  Ms. Rojas said at the time was that she knew she was

24  harboring illegal aliens who were working as

25  prostitutes.  So that's how we left it, which is

1  sufficient under the --

2      THE COURT:  It is sufficient, but if she can't

3  stand there and tell me she was doing what she was

4  doing, then I take it ill.

5          This is not Martha Stewart.  I don't even

6  know what Martha Stewart does on her programs, but this

7  is not some program where we dance around the edges.

8  They've got a list of women -- I don't know, 20 or 30 of

9  them -- who just happened to be having sex on your

10  premises.

11      DEFENDANT MARIA ROJAS:  Yes.

12      THE COURT:  And they were illegal immigrants

13  who had been brought to you so that they could work off

14  their bill to coyotes, through pimps or directly or

15  however it was done.  You knew you were part of a

16  process by which women, who should not have become

17  prostitutes and should not have entered the country

18  illegally, used your facilities to help them further

19  their careers, and you did it knowingly and willfully.

20  That's why you are here.

21          Do you have any question about that?

22      DEFENDANT MARIA ROJAS:  No.

23      THE COURT:  Do you have anything you want to

24  tell me that is not inconsistent with that?

25      DEFENDANT MARIA ROJAS:  No, sir.  I'm sorry.

1    THE COURT:  Mr. Rojas, do you have anything you

2  would like to tell me?

3    DEFENDANT JOSE ROJAS:  I have nothing to say.

4    THE COURT:  I don't understand the restitution

5  component of this.  I understand if people were not paid

6  minimum wage, that's a different kind of problem, but

7  it's not a restitution to this crime itself.

8    MR. MAGLIOLO:  Might we address that at -- I

9  can't give the Court a good answer this time.  Can we

10  address that -- may we have perhaps a restitution

11  hearing after this, Your Honor?  The statute calls for

12  restitution, and the only way we knew to try to figure

13  out an amount is through the Department of Labor because

14  that's what they routinely do.

15    THE COURT:  I'm going to have to give it to the

16  women who were not paid.  And if one of these women

17  stayed six years and was making $300 a day --

18    MR. MAGLIOLO:  But they didn't.  On our break,

19  I talked to one of the lead investigators, Your Honor,

20  and he explained that, again, early in the scheme they

21  would bring their own prostitutes in.  But once that was

22  over and the pimps supplied the prostitutes, 98 percent

23  of that group, based on the investigator talking to the

24  women, were there not to pay off a smuggling debt, but

25  because they had been wined and dine and wooed by their

1  pimp in Mexico, then brought to the United States

2  thinking they were going to have a great life, and then

3  forced by the pimp into prostitution.  The pimp received

4  money, the girls received virtually nothing.

5          THE COURT:  All right.

6          MR. MAGLIOLO:  So they didn't receive -- and my

7  understanding, and again subject to review, is that the

8  restitution is based on a minimum amount of money, a

9  minimum wage that they should receive for the hours they

10  put in, less what they received, which was basically

11  nothing.  And that's why --

12          THE COURT:  And I'm having a hard time

13  believing -- it didn't take these women long to realize

14  that they didn't owe anybody -- the last class of

15  participants -- they didn't owe anybody any money.  They

16  would come with Joe Bob and he said, "We're a little

17  short, so you go be a prostitute."

18              Yes, he could force her, but why wouldn't

19  he owe restitution?  Because that's not part of her

20  deal.  She's furnishing the facility, which is still

21  illegal.

22          MR. MAGLIOLO:  I understand.

23          THE COURT:  And I'm having trouble with the

24  compulsion, except that however bad this must have been

25  for some of them, it had to be better than the

1  alternative jobs available in the American economy to an
2  illegal alien with no skills.
3          MR. MAGLIOLO:  Well, I differ with the Court on
4  that.
5          THE COURT:  Tell me what she was supposed to go
6  do.
7          MR. MAGLIOLO:  I mean, anything would be better
8  than I would think being forced into prostitution when
9  that wasn't your plan.
10          THE COURT:  But you're assuming forced?
11          MR. ADLER:  Some of the depositions showed
12  these women were prostitutes long before they came into
13  the United States --
14          MR. MAGLIOLO:  Your Honor, the depositions that
15  he's referring to --
16          THE COURT:  Let him finish.
17          MR. MAGLIOLO:  I'm sorry.  Well, they continue
18  to refer to these depositions.  Those depositions were
19  things they chose to take over people who weren't even
20  witnesses in this case, Your Honor.  The witnesses in
21  this case is what I'm talking about.
22          THE COURT:  You didn't want to call the
23  witnesses who testified his way.  He would have called
24  them.
25          MR. MAGLIOLO:  That's why they didn't call

1  them, Your Honor, because they didn't testify his way.

2          MR. ADLER:  We didn't ask for depositions.

3  They did, by the way, Judge.

4          MR. PEREZ:  That is not true, Judge.  That's

5  not true.  Judge, our witnesses were in the Indictment.

6  After the indictment occurred, we told the defense,

7  "There were some women who were arrested.  We don't

8  really want them, but we don't want to be accused of

9  sending these women without you having talked to them.

10  They are at the detention center."  They asked for the

11  depositions and we did the depositions.

12          MR. MAGLIOLO:  Actually, the Court ordered the

13  depositions.

14          THE COURT:  Yeah, because I didn't want them to

15  stay at the Detention Center, first.  And second, they

16  needed to know what your people thought they knew and --

17  but I can't analyze the 37 women and find out which ones

18  liked being a prostitute, which ones were forced, which

19  ones were paying off a debt.

20          MR. MAGLIOLO:  Again, based on the agent, the

21  lead agent who talked to these women, he told me

22  specifically approximately 98 percent of the women in

23  the second phase of this operation were forced into the

24  prostitution.

25          THE COURT:  And he could have kept records so

1  he could tell me --

2      MR. MAGLIOLO:  He talked to each and every one

3  of them, Your Honor.

4      THE COURT:  Then where is the schedule of their

5  name, when they came, how long they worked there, who

6  forced them, whether it was Rojas or whether it was Jim

7  Bob?

8      MR. MAGLIOLO:  Again, they were forced by their

9  pimps.  This second group wasn't necessarily forced by

10 these defendants, Your Honor.

11     THE COURT:  But counsel, the agent, if he does

12 his job, writes down what the lady says the pimp's name

13 was.

14     MR. MAGLIOLO:  It's in each and every

15 debriefing and report, Your Honor.  We'd be happy to

16 present them to the Court.

17     THE COURT:  Well, I should have gotten that

18 instead of a wage and hour chart like they're a bunch of

19 waitresses at Denny's.  And I don't mean anything bad

20 about Denny's.

21     MR. MAGLIOLO:  Yes, Your Honor.

22     THE COURT:  I like Denny's.

23          It seems to me the solution is a fine and

24 not restitution in this case.

25     MR. MAGLIOLO:  The reason it was presented to

1  you, the statute calls for restitution, Your Honor.

2     THE COURT:  But I have to --

3     MR. MAGLIOLO:  I understand.

4     THE COURT:  I mean, as I understand it, you can

5  not necessarily tell me that if I gave money to Irma

6  Benavides, we could get it to her.

7     MR. MAGLIOLO:  The way we've done it in the

8  past, there was a pot of money and then it was divided,

9  I believe, with the girls.  A pot of money was then

10 given to the girls as the attorney, I think, for the

11 women saw fit was my understanding.  That's the way it

12 was done in the past.  This is still a pretty new area,

13 Your Honor, as far as --

14    THE COURT:  Are these women going to be

15 deported?

16    MR. MAGLIOLO:  No, Your Honor.  The statute

17 calls for them to be ably put in a position to achieve

18 citizenship if, in fact, they follow all the rules and

19 regulations, and most of the women are in that position.

20 They now have jobs, they are going to school, and they

21 are working toward citizenship, Your Honor.

22    THE COURT:  And the women on this chart are the

23 only ones we have identified?

24    MR. MAGLIOLO:  Yes, I believe that's correct,

25 Your Honor.

1          THE COURT:  All right.  Why don't you lump them

2     up by person, because we've got some of them here two or

3     three times, so we have an amount next to each of them.

4          MR. MAGLIOLO:  We will, Your Honor.

5          THE COURT:  And I believe -- this is not a

6     ruling yet, but I believe that I'm going to award a

7     disproportionate amount to some of them who were there

8     briefly than I am somebody who stayed seven years.

9          MR. MAGLIOLO:  Yes, Your Honor.

10         THE COURT:  I just believe that if you stayed

11    that long, you made a judgment call.  But if you're

12    forced to stay there two months, that's different.

13         MR. MAGLIOLO:  Yes, Your Honor, I understand.

14         THE COURT:  Schedule the people with the

15    Department of Labor's numbers.

16         MR. MAGLIOLO:  Yes, Your Honor.

17         THE COURT:  And then we can work out an

18    approximation, it seems to me, to reflect the likelihood

19    of involuntariness.

20         MR. MAGLIOLO:  I understand, Your Honor, and we

21    will do that, yes, Your Honor.

22         THE COURT:  Which means we can't do the

23    judgment until after we do that.

24         MR. MAGLIOLO:  Yes, Your Honor.

25         PROBATION OFFICER:  Your Honor, we can do a

1  judgment.  The Court can take up to 90 days to have a
2  restitution hearing.

3          THE COURT:  Yes, ma'am, that's exactly what I
4  meant to say.

5          MR. MAGLIOLO:  Yes, Your Honor.  That's what I
6  heard, Your Honor.

7          MR. ADLER:  We have no problem with that,
8  Judge.

9          MS. HADEN:  Your Honor, could I interject?  We
10 would have the forfeiture part, which plays into the
11 restitution in that the net forfeited funds can be -- we
12 can request that those be applied towards any
13 restitution order the Court imposes.

14         THE COURT:  That's the order problem is I want
15 the forfeiture to go to the restitution first and then
16 to Eric Holder second.

17         MS. HADEN:  That would be our intent, Your
18 Honor, for that.  We've already looked behind all of
19 that and it is available and we would request it and
20 work to make that happen as soon as we have a
21 restitution order.

22         THE COURT:  And we have, I believe, three
23 houses, four houses, and there are 10 --

24         MS. HADEN:  There's 10 properties, Your Honor,
25 that are all included:  Houses, two vacant lots -- or

1 three vacant lots, one where there was a temporary

2 brothel.

3       THE COURT:  And a vacant lot.

4       MS. HADEN:  And we have vacant lot with pallets

5 on it, a makeshift building.

6       THE COURT:  Maybe people from the Seventies

7 like to get back to nature or something.

8          All right.  Now, I don't know whether I

9 questioned you about this before, but I need to know

10 that every mortgage holder has been notified.

11       MS. HADEN:  There are no mortgage holders, Your

12 Honor.

13       THE COURT:  And that there are any competing

14 interests.  I want you to get a title report on every

15 tract of land --

16       MS. HADEN:  We have done that.

17       THE COURT:  -- so that we can have an exact --

18 I want the people of America and the victims to get good

19 title.

20       MS. HADEN:  We have double-checked three or

21 four times.  I think you brought that up last time.

22       THE COURT:  Because I'm an old land lawyer,

23 which didn't seem like a bad thing when I was doing it.

24         I take it the Rojases are not eligible for

25 any further stay in the United States?

1      MR. MAGLIOLO:  That's correct, Your Honor.

2      THE COURT:  All right.  For both of you, I

3  sentence you to 16 years in prison on each count,

4  concurrently, five years of supervised release on Count

5  One, three years on Count Two, one year on Count Three,

6  to be served concurrently, for a five year supervised

7  release -- and I've already made a mistake.

8      PROBATION OFFICER:  Your Honor, Count Two, the

9  maximum is 10 years.

10      THE COURT:  I'm sorry, the years and the months

11  drive me crazy.  So 16, 10 and 2.  Right?

12      PROBATION OFFICER:  Yes, Your Honor, to be run

13  concurrently.

14      THE COURT:  Concurrently.

15          We will have a restitution forfeiture

16  hearing --

17      CASE MANAGER:  April 17th, 2:30.

18      THE COURT:  -- 2:30, April 17th.  Shall we pass

19  the special assessment for the purposes of getting more

20  money to restitution?

21      MR. MAGLIOLO:  Yes, Your Honor.

22      THE COURT:  The $300 in each case is waived.

23      MR. PEREZ:  Your Honor, it's 200 on Mr. Rojas.

24      THE COURT:  200.

25      MR. PEREZ:  And 300 on her.

1        THE COURT:  And then I just have to drop a

2    count off of him, don't I?

3        MR. PEREZ:  Well, he didn't have a count.  He

4    had two counts, which was the sex trafficking and the

5    harboring.  She had three counts, which was the sex

6    trafficking, the harboring, and the illegal re-entry.

7        THE COURT:  All right.  16 years total.

8        MR. MAGLIOLO:  Thank you, Your Honor.

9        THE COURT:  Anything else?

10        MR. MAGLIOLO:  Nothing from the United States,

11   Your Honor.

12        MR. ADLER:  Couple of things, Judge, briefly.

13   I assume all the objections are overruled; is that a

14   correct assumption?

15        THE COURT:  Yes, sir.

16        MR. ADLER:  And lastly, I think our colleagues

17   with the Public Defender's Office have instructed us

18   that we should object to the sentence as being

19   procedurally and substantively unreasonable and greater

20   than necessary to achieve the sentencing -- the goals of

21   the sentencing statute.

22        THE COURT:  Who is it that told you I was

23   unreasonable?

24        MR. ADLER:  I'll spell it for you.  It's

25   P-e-r-e-z, first name Ruben.

1        MR. PEREZ:  Not true, Your Honor.

2        MR. MAGLIOLO:  We've been blamed for

3  everything else.

4        THE COURT:  I thought that's why you brought

5  him so you could blame things on him.

6        MR. MAGLIOLO:  Yes, Your Honor.

7        THE COURT:  I don't believe it is.  I have

8  serious reservations about what I will call

9  semi-puritanical, moralistic, over-reactions in criminal

10  law.  In this case we had what would pass in the context

11  as an industrial operation.  It wasn't fortuitous, it

12  wasn't some girls and a pimp, it wasn't just routine

13  commercial sex.  It was the wholesale importation, which

14  gives the Court jurisdiction of people to be used in

15  prostitution and elsewhere.  And that from the

16  information I've received from 12 or so defendants who

17  have confessed before me, was there was nothing subtle,

18  that this wasn't a girl misbehaving in the back room.

19  It was a calculated, streamlined process of using the

20  illegal immigrants in their prostitution, and imported

21  for that purpose.

22            And I have to say that the girls knew when

23  they crossed the border illegally that they were

24  participating in a crime.  So they are not being

25  kidnapped or tortured to bring them up here.  They all

1  had made an election, and they shouldn't have.  But they

2  wouldn't have had the opportunity if the Rojases had not

3  had a business.

4          MR. MAGLIOLO:  Thank you, Your Honor.

5          MS. HADEN:  Your Honor, on the forfeiture, we

6  don't have a statute that allows us to extend it after

7  sentencing.  The Government filed a Motion for

8  Preliminary Order of Forfeiture with a supporting

9  affidavit and a Proposed Order, and I didn't know if the

10 Court had a ruling on the Proposed Order of Forfeiture

11 today.

12         MR. MAGLIOLO:  I don't think the defendants

13 are opposing that, Your Honor, if that helps at all.

14         THE COURT:  No, I don't think so, either.  It's

15 just my concern about her work quality.

16         MR. MAGLIOLO:  We chose the best, Your Honor,

17 to help us.  As the Court knows, we need it.

18         THE COURT:  I'm going to sign it, ma'am,

19 because there is no way I can go through here --

20         MS. HADEN:  I'm sorry, Your Honor, we filed it

21 last week hoping the Court could review it before.

22         THE COURT:  No, but I would have to -- to make

23 any sense of it, I'd have to have get the title

24 reports and correlate them.

25         MR. MAGLIOLO:  If it please the Court, they

1  really did spend a lot of time going through it.  There

2  is no way we would want to present something to the

3  Court that later on would have some title --

4        THE COURT:  The only bad thing I know about her

5  is she hangs out with you.

6        MR. MAGLIOLO:  Yes, sir.  Thank you, Your

7  Honor.

8        MR. BENNETT:  Your Honor?

9        THE COURT:  Wait a minute.  Today is the 9th.

10           Yes, sir?

11        MR. BENNETT:  We would join our co-defendant in

12  the objections made here, as well as in the objections

13  to the Presentence Investigation Report, and ask if our

14  Presentence Investigation Report objections have also

15  been overruled for the record?

16        THE COURT:  Yes, they have been overruled.

17        MR. BENNETT:  And may we join the defendant in

18  his objections?

19        THE COURT:  Except that unreasonable part.  I

20  want you to call me unreasonable to start with.  I like

21  that.

22        MR. BENNETT:  Your Honor -- and I can write

23  this.  Your Honor, as to Jose Luis Rojas, that the

24  sentence is both substantively and procedurally

25  unreasonable, and we object.

1    THE COURT:  That's a legal conclusion, not a

2  factual basis, isn't it?

3    MR. BENNETT:  Yes, Your Honor.

4    MR. PEREZ:  Judge, I just want the record to be

5  clear, I think Mr. Adler did say he had no objections to

6  the Amended Order of Forfeiture.

7         Is that correct, Mr. Adler?

8    MR. ADLER:  Really, what I was saying is, if

9  the Court wanted to delay it, I didn't mind waiting

10  until we had this hearing to do it all at once.

11    THE COURT:  He doesn't --

12    MR. MAGLIOLO:  He signed it.

13    THE COURT:  Mr. Adler, it's the restitution

14  that bothers me.  Now, the forfeiture is to fund the

15  restitution.  What worries me is that somebody from

16  Washington with dark sunglasses flies down and takes the

17  money and says there is nothing left for restitution.

18  And I've been told on occasion, "Well, that's our

19  intent, but we won't promise it."

20    MS. HADEN:  Unfortunately, Your Honor, the

21  properties are not going to bring that much money, but

22  we'll do the best we can to get restitution back.

23    THE COURT:  Every little bit helps.

24    MR. PEREZ:  Thank you, Your Honor.

25    MR. MAGLIOLO:  Thank you, Your Honor.

1    THE COURT:  You have the right to appeal, you

2  have a right to have a lawyer on appeal, and to appeal

3  without paying costs.  There is a statement about that.

4  It's in Spanish on the back.  Please read it, and if you

5  understand it, sign it.

6    **[Pause]**

7    MR. BENNETT:  Mr. Rojas wants to appeal and

8  would like someone other than me to handle the appeal.

9  I was appointed.  I think it makes more sense for me to

10  withdraw after the restitution hearing.

11    THE COURT:  You may move now, but I'm not going

12  to let you out until after the restitution hearing.

13    Did he give up his right to an appeal?

14    MR. BENNETT:  I don't believe so.  I believe it

15  was a straight plea to the Indictment.

16    THE COURT:  Okay, I don't know.

17    He's going to be your lawyer until we

18  figure out the money, and then we get you somebody else.

19    And while everybody is here, I again thank

20  my probation officers for considering a whole lot of

21  material and organizing it and being much more

22  diplomatic in correcting my errors than Mr. Perez.

23    MR. PEREZ:  I concur, Your Honor.  They did a

24  wonderful job.

25    THE COURT:  I am very lucky to have their

1  support.

2      MR. BENNETT:  Mr. Rojas has something that he

3  would like to say to the Court.

4      THE COURT:  Yes, sir?

5      DEFENDANT JOSE ROJAS:  Excuse me, sir, but I

6  have a letter of recommendation of a job that I held

7  before.  I wasn't working there at that time.  I do

8  sheetrock and I used to do maintenance work.  I believe

9  you were shown that letter.

10     MR. BENNETT:  And for the record, Your Honor,

11 the complaint is that the Court didn't -- I mean, I

12 didn't give the Court the letter.

13     THE COURT:  And I'm sure you are good at that.

14 And if things go well, you may have the opportunity to

15 continue to do that while you are in prison and improve

16 your skills.  You can be both a very good sheetrock

17 worker and violate the law in other respects.

18     DEFENDANT JOSE ROJAS:  I'm being accused of

19 being a part, and I wasn't a part of.

20     MR. BENNETT:  That's the point of the letter,

21 Your Honor.

22     THE COURT:  Many of us have worked multiple

23 jobs.

24         Thank you, counsel.

25     *[3:25 p.m. – Proceedings concluded]*

# REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript
from the record of proceedings in the above-entitled
cause.


/s/ Ed Reed                          6-26-12
Edward L. Reed                       Date
Official Court Reporter