1    IN THE UNITED STATES DISTRICT COURT
        FOR THE SOUTHERN DISTRICT OF TEXAS
2                HOUSTON DIVISION

3
UNITED STATES OF AMERICA        )
4                               )
VS.                             )    NO. H-11-CR-116
5                               )    May 30, 2012
MARIA ROJAS, ET AL              )
6

7
                    HEARING ON RESTITUTION
8          BEFORE THE HONORABLE LYNN N. HUGHES

9

10

11

12   For the Government:        Mr. Joe Magliolo, AUSA
                                Mr. Ruben Perez, AUSA
13                              Ms. Cynthia DeGabrielle, AUSA
                                Ms. Katherine Hayden, AUSA
14                              U. S. Attorney's Office
                                910 Travis, Suite 1500
15                              Houston, Texas 77002

16   For Defendant              Mr. David Adler
     Maria Rojas:               Ms. Sue Jana
17                              David Adler, PC
                                6750 West Loop S., Suite 120
18                              Bellaire, Texas  77401

19   Court Reporter:            Bruce Slavin, RPR, CM

14:44  20

21

22

23

24
     Proceedings reported by mechanical stenography and produced
25   by computer-aided transcription.

1        THE COURT:  Mr. Perez --

2        MR. PEREZ:  Yes, Your Honor.  Good afternoon.

3        THE COURT:  -- good afternoon.  Have we got an

4    estimate of the cash recoverable from the property?

5        MR. PEREZ:  I think Miss Hayden may speak to that,

6    Your Honor.

7        MS. HAYDEN:  Your Honor, we have the appraised

8    value, but you know how that can be.  The property has been

9    vacant for over a year, year and a half to two years.  It

10   would just be a guesstimate.  I mean --

11       THE COURT:  What was the appraised value?

12       MS. HAYDEN:  The total amount of the properties

13   were appraised at anywhere between 450- to 500,000 total for

14   all ten properties.  They have taxes outstanding on all of

15   them and things like that.

16       THE COURT:  All right.  Thank you.

17           Now, I thought the last time we were together

18   we talked about putting this into a fund and people would

19   draw against it and then, when it was proportionate to their

20   need or, I mean, proportionate to something, then, if some

21   didn't need it, we could use that to help the needs of

22   others after they exhausted it.  Is that what we talked

23   about?

24       MR. PEREZ:  Your Honor, just for the record, we're

25   submitting Document 299.  I know what was submitted right

1    before that, the one that we tried -- The one that we're

2    asking the Court to consider is Document No. 299, the order

3    of restitution.

4         MR. MAGLIOLO:  I can address that, Your Honor.  We

14:46  5    did talk about it.  We just did not know -- on this side, on

6    the criminal side, we just did not know the mechanism to do

7    that.

8         THE COURT:  I still don't know.

9              Yes, Miss DeGabrielle.

14:47  10        MS. DeGABRIELLE:  Your Honor, for the record,

11   Cynthia DeGabrielle for the United States.

12             I have done some research into other

13   situations with minor victims and other victims in which the

14   Court may want to set up a fund for future needs as opposed

14:47  15   to strictly past compensation.  I have a couple of forms

16   that have been used in other districts that I am studying

17   now.

18             What those courts have done is essentially set

19   up a trust, which is -- it's not realistic to expect the

14:47  20   district court clerk to administer those funds because it

21   might be complex.  But what these courts have done is set up

22   a separate trust fund with a trustor, a trustee and a

23   mechanism by which the expenses of the victim are assessed.

24   And I'll be glad to provide some suggestions to the Court if

14:48  25   the Court would like.

 1          THE COURT:  Okay.  I mean, that's going to take

 2     some time, but I need to decide which -- and I guess the

 3     important thing is that, while $450,000 is a nice sum of

 4     money, it's two-thirds of the first request, and that

 5     request -- I have some discussion for that later.

 6               Mr. Adler.

 7          MR. ADLER:  Judge, I don't really have a dog in

 8     this fight so long as the Court stands by its prior ruling

 9     that the restitution amount will not be any greater than the

10     amount recovered from the forfeited properties.  The only

11     reason I rise is to express a concern to the government and

12     the Court that the way this order is worded I don't know if

13     you can just cut a check to a minor and the order say that

14     the money is --

15          MR. MAGLIOLO:  All are adults now, Your Honor.

16          MR. ADLER:  Oh.  Okay.  I didn't realize that.

17          THE COURT:  I thought one of them was still 17.

18          MR. MAGLIOLO:  I don't believe so, Your Honor.

19          THE COURT:  The function of the trust is not that

20     they're a minority.  It was for seeing that the money went

21     carefully.  You know, this is a limited fund and I think it

22     should be spent to the extent it's reasonable and all that

23     for restorative benefits.

24               All right.  I did -- if you see the chart

25     there --

1        MR. PEREZ:  Yes, Your Honor.

2        THE COURT:  So, I took the months that they worked

3   and then next is the percentage of the total time that the

4   five of them worked.  And then assuming -- I didn't know the

14:50   5   figure.  I assumed $500,000 was a realistic figure.  And,

6   so, the next one is what they would get if $500,000 were

7   recovered based on prorating it by the time spent.

8            The next column is the actual request that has

9   been made, and the last column is the percentage of the

14:50   10  funds available that that request represents.

11           Miss DeGabrielle, do you have a suggestion

12  about a presumptive allegation based on tenure?

13       MS. DeGABRIELLE:  Your Honor, my concern with

14  regard to the financial litigation aspect is just making

14:51   15  sure that the losses each victim suffered or experienced is

16  somehow recorded in the record with the Court at least --

17       THE COURT:  Well, I would -- You could probably

18  make a claim for $450,000 for each of them and support it

19  with something slightly different from Michigan's, but,

14:51   20  still, on the other hand, we're not capable of ascertaining

21  that one of them wasn't scarred by it at all or does not now

22  appear to be scarred, from some professional point of view.

23  It seems to me that how long they were there represents

24  approximation of the level of exposure to the harm.

14:52   25       MS. DeGABRIELLE:  Yes, Your Honor.

             1          THE COURT:  Now, to get a liquidated sum, I could

             2     simply double -- make it a million-dollar restitution order

             3     for the proceeds and then say that each one gets this

             4     fraction held in trust.  I mean, what we have to work out

    14:52    5     is -- and I don't believe you were here last time -- is one

             6     of these girls is going to disappear.  She's going to decide

             7     that she's had enough of this and move to Belgium or

             8     something.  That money should not be wasted.  I believe it

             9     will be easy to find a trustee who would be willing to do

    14:53   10     this, and I am willing to help to cut the trustee's costs,

            11     but there are these plan administrators in tort litigation.

            12     When there's a settlement, the lawyers don't know anything

            13     about it.  And, so, they keep track of the people and they

            14     process the claims and present them to me.

    14:53   15          The mechanics we can work out.  It's what we

            16     say that makes it definitive, because, once the land is

            17     sold, then we just have a pile of cash, and then the Court

            18     will hold the proceeds of the restitution, whatever it is,

            19     from these -- ten properties, is it?

    14:54   20          MS. HAYDEN:  Yes, Your Honor.

            21          THE COURT:  -- ten properties will be held in trust

            22     presumptively allocated by their approximate tenure on

            23     Clinton Drive.  I don't know what else we could do.

            24          MS. DeGABRIELLE:  Your Honor, the statute provides

    14:54   25     for the order in which funds are paid out to victims, and

1  when a victim is no longer there or no longer available to

2  receive the money, then there is a procedure for handling

3  that.

4          THE COURT:  We'll just go pro rata.

14:55  5          MS. DeGABRIELLE:  Yes.

6          THE COURT:  So, if the person who had 45 percent of

7  the time dropped out, it would simply double everybody

8  else's percentage.

9          MS. DeGABRIELLE:  Yes, Your Honor.

14:55  10          THE COURT:  All right.  Mr. Perez, are you

11  following your co-counsel?

12          MR. PEREZ:  Yes, Your Honor.

13          THE COURT:  One observation.  While we are unable

14  to do some of the things, the work done and the requests

14:55  15  made by the YMCA are significantly more thoughtful and

16  limited to what they should have been.  I want to speak

17  briefly about Michigan.

18                  We have a Texas claim for $725,000.  The YMCA

19  or whatever it is, the "Y", says that it will cost them

14:56  20  about $4,000 to get legal assistance to adjust their

21  immigration status.  In Michigan that costs $35,000 or

22  10 plus 25 that somehow they have already incurred.  Doing

23  what I have no idea.  I have seen a whole bunch of lawyers

24  on that side of the table, but they have all been paid by

14:56  25  somebody other than Lutheran Services of Michigan.

1    The extrapolations and things -- And while I

2    agree in an ideal world she should get to go to college for

3    free, the money is not there, first of all; and, second of

4    all, if it were, it probably ought to be spent or retained

14:57  5    to make sure that the others all got whatever counsel is the

6    most penetrating, profound and long-lasting.  Job counseling

7    we could get from dozens of places for free.  Competent

8    psychotherapy is a somewhat more expensive and essential

9    program because, whatever the effects of this experience

14:57  10   are, they can interfere with education, employment and other

11   relationships, where job counseling, because you've got to

12   write a resume and some things like that, you could do while

13   "disturbed" -- judging by my clerk's applications.  I have

14   never seen Mr. Perez's resume, but....

14:58  15   So, that's the plan.  It's still tentative

16   because we have to work out the details.  I don't think we

17   need to have you here for working out the trust and finding

18   a trustee and that sort of thing.

19   MR. MAGLIOLO:  If it please the Court, there was

14:58  20   one thing that would make the transfer of property perhaps

21   smoother, and even though, arguably, this defendant has

22   right to the property that has already been forfeited, to

23   help effectuate the transfer of title a lot of times the

24   title companies want the last owner's signature or at least

14:59  25   something indicating they are transferring the title, and we

1   have brought that paperwork today.  I didn't know if the --

2   Would the Court want to order the Defendant to sign that

3   or --

4          THE COURT:  No.  I would ask him politely to do it.

14:59  5          MR. MAGLIOLO:  And that's what I was wondering,

6   because that would effectuate the -- because we don't want

7   to -- it would be worth less if there's any kind of cloud on

8   the title, Your Honor.

9          THE COURT:  Yes, sir.  Before I got this cushy

14:59  10  government job I actually did a lot of land work as a

11  lawyer.  That's why I am being picky with you all when you

12  bring me these orders that wasn't conveying the title.

13           Is there an acknowledge on the document?

14         MS. DeGABRIELLE:  The proposed document?

15:00  15        THE COURT:  Yes, ma'am.

16         MS. DeGABRIELLE:  Yes, Your Honor.

17         THE COURT:  May I see an exemplar.

18         MS. DeGABRIELLE:  Yes, Your Honor.

19         THE COURT:  Actually, I think it needs an

15:00  20  acknowledgment and not a jurat.  It needs to say this person

21  acknowledged he executed....

22         MR. ADLER:  The government has very politely asked

23  me to present this document to my client and I have done so.

24  She has declined to sign it.  I am concerned that if the

15:00  25  Court orders her to sign it that it may be seen as some type

1   of waiver or possible appellate issue on our part.  She does

2   not want to sign it.  I agree with the government that she

3   has forfeited, as of the Court's order, all interest in the

4   property; so, it doesn't seem to be necessary for the

15:01   5   transfer.

6           And I would respectfully disagree with

7   Mr. Magliolo's comment that it somehow affects the value of

8   the property whether she signs this.  The Court has divested

9   her, through the forfeiture order, of any interest in this

15:01   10   property.  So, compelling her to sign this seems

11   inappropriate and unnecessary.

12           THE COURT:  Why is it inappropriate?

13           MR. ADLER:  Inappropriate in the sense that you're

14   forcing her to sign a document that may preclude her from

15:01   15   raising an issue on appeal.

16           THE COURT:  If she does it under compulsion I'm not

17   sure there is, technically, a waiver.

18           MR. ADLER:  But it just doesn't seem necessary

19   since the forfeiture -- I don't think I have ever been

15:01   20   presented with this kind of document before, because when

21   the property is forfeited, under the law, her interest in

22   the property no longer exists.

23           THE COURT:  DeGabrielle's middle name is "Belt and

24   Suspenders".  When you buy a piece of land every bypasser

15:02   25   you see on your way to the courthouse will sign a waiver.

1          MR. ADLER:  And I think, outside the criminal

2    context, that's good practice.

3          THE COURT:  I don't understand why it would waive

4    her technical claims on appeal, but....

15:02    5          MS. DeGABRIELLE:  Your Honor, may I clarify

6    something on the record?  As Miss Hayden made it clear in

7    the memorandum that we submitted to the Court, the United

8    States does not intend to proceed with forfeiting properties

9    but, rather, in order to get the restitution to the victims

15:02   10   more quickly, we will proceed through the financial

11   litigation statutes under the Federal Debt Collection

12   Practices Act or under a direct order of the Court, if the

13   Court elects to go that way under the All Writs Act.  But,

14   in any event, it is not our intention to finalize the

15:03   15   forfeiture so as to avoid the money going into the hands of

16   the Attorney General.

17         THE COURT:  Well, but are we going to hold the

18   funds until the appeal is over?

19         MS. DeGABRIELLE:  No, Your Honor.  Our right to

15:03   20   execute a lien or to foreclose on a lien is not stayed

21   pending Defendant's appeal unless the Defendant asks the

22   Court to stay execution until the judgment is -- and the

23   Court orders us to stay execution of judgment.

24         MS. HAYDEN:  Just to add, Your Honor, I believe the

15:03   25   forfeiture was unopposed and the restitution is unopposed.

1   I don't know if that makes any difference, but on appeal I'm

2   not really sure what the appellate issues would be since

3   both have been unopposed.

4        MR. ADLER:  Judge, there were sentencing objections

15:04  5   raised in the way the restitution was calculated, number

6   one.  What I'm not opposed to, on behalf of my client, is if

7   the restitution amount is not larger than what is obtained

8   from the forfeited properties, then I don't believe that's

9   going to be an issue.

15:04  10       THE COURT:  Well, I thought I ordered it.  Didn't I

11  say that in the order?

12       MR. ADLER:  I think you said it in court.  I don't

13  remember if it was in the order, but I don't know if the

14  government has the same recollection as I do.

15:04  15       THE COURT:  Well, I thought I made that commitment.

16  Whether it was orally or in writing I don't actually know.

17       MR. MAGLIOLO:  Your Honor, that's also the way the

18  government remembers it.  That's why we were surprised that

19  the Defendant, after getting that commitment from all

15:04  20  parties involved, would refuse to sign the paperwork that

21  would help the liquidation of the property.  It was all done

22  per -- That's what counsel had represented to the Court and

23  that's what the government pretty much was in agreement

24  with.  So, this is a new wrinkle today, the Defendant

15:05  25  refusing to sign the transfer of documents.

1          THE COURT:  Well, now we have gotten a waiver from

2     the government to restitution above the proceeds of the ten

3     properties.  So, why can't she waive her interest in the ten

4     properties?

15:05  5          MR. ADLER:  And, Judge, all I can tell the Court

6     is, after discussing it with her, she does not want to sign

7     this waiver.  And, again, although I understand that it may

8     make things easier for the government in dealing with the

9     title policies, she doesn't want to sign it and she has been

15:05 10    divested of any right in the property.  So, it doesn't seem

11    to be necessary.  It doesn't affect the value of the

12    restitution.  And our decision --

13          THE COURT:  Well, you can't tell whether it will

14    affect the value or not.  I mean, I don't know what state

15:06 15    the title is in, period.  You know, what we have done here

16    is forfeit her interests.

17          MS. HAYDEN:  Yes, Your Honor.  She's co-owner with

18    co-defendant Javier Belmontes and he is set for sentencing

19    June 18th.  He has agreed to forfeit his interest in seven

15:06 20    of the properties.  And her plea agreement -- the government

21    agreed to allow him to retain his interest in three of the

22    properties.  So, that's the state of the title.  There's no

23    other owners in the property other than those two

24    individuals.

15:06 25          THE COURT:  So, is he going to consent to the

1   government's selling the three and splitting the proceeds?

2           MS. HAYDEN:  Yes, Your Honor.  That is my

3   understanding.

4           THE COURT:  Because you don't want me to be in

15:06  5   business with him.

6           MS. HAYDEN:  Exactly.

7           THE COURT:  And vice versa.  I mean, if he is

8   smart, he doesn't want to have you as a partner.  Not

9   personally.  "You" being the government.

15:07  10          MS. HAYDEN:  I understand.

11          THE COURT:  All right.  Let me think about that.

12  This is not the ruling, but my sense is that I have a

13  reluctancy to compel her to sign a document which only

14  pertains to what should be a closed issue on the title of

15:07  15  the property, the forfeiture of which she has also agreed

16  to.

17          MS. DeGABRIELLE:  Your Honor, as the Court

18  contemplates this issue, I would just like to bring to the

19  Court's attention -- I am sure the Court is aware of the All

15:08  20  Writs Act and the authority in the court to execute whatever

21  order is necessary to carry out the Court's business.

22          THE COURT:  It's one of my favorite acts.  'He can

23  do what he wants.'  It actually turns out it doesn't mean

24  that, but....

15:08  25          MS. DeGABRIELLE:  So, the fact that some of the

issues raised by defense counsel about the Court questioning
maybe the Court's authority or risk of appearance of
oppression in ordering the Defendant --

THE COURT:  It's my job.

MS. DeGABRIELLE:  -- that could become final with
the All Writs Act, Your Honor.

MR. ADLER:  I'm not questioning the Court's
authority.  And, of course, if the Court orders her, she
risks being held in contempt if she refuses.  I am simply
saying she has declined to sign it, and it seems to me there
is another way to get where the government needs to be.  If
it's the title companies that want some proof, then perhaps
an order stating the status of the situation from the Court
might carry more weight than any possible waiver she might
sign.

THE COURT:  I am going to think about this.

Has the government talked to the title
company?

MS. DeGABRIELLE:  With regard to these properties,
no, Your Honor, but we are dealing with these issues in a
broader scope with other properties.  We're in the process
of trying to educate title companies about what a court
order divesting someone of ownership means.  Other districts
in Texas don't seem to have the same trouble that we have.
I think we'll eventually get there.  It's just we haven't

1   gotten there yet.

2        THE COURT:  Well, it's not a common problem,

3   although they must deal with bankruptcy orders all the time.

4        MS. DeGABRIELLE:  I think the bankruptcy statutes

15:10  5   carry a procedure for acquiring title just like the

6   forfeiture statutes do, but --

7        THE COURT:  So does the Texas law.

8        MS. DeGABRIELLE:  So, if we foreclosed on a lien,

9   for example --

15:10  10        THE COURT:  Or she might just decide to have

11   it forfeited and admit she doesn't want the properties in

12   exchange for a plea and all that stuff.  I mean, I don't

13   know why I couldn't quiet title.

14        MS. DeGABRIELLE:  It's a matter that needs to be

15:10  15   raised with the U.S. Marshal Service as well, Your Honor.

16   Maybe we can get them and the title companies onboard on

17   these matters that fall into that...prior to --

18        THE COURT:  How do you select the title company you

19   use?

15:11  20        MS. DeGABRIELLE:  I think we'll select one that

21   understands how to represent that a title is forfeitable,

22   you know, when there is this glitch in the chain of

23   ownership that --

24        THE COURT:  It's not really a glitch.  This order

15:11  25   is no different than a probated court order that says that

1  "X" died and now "Y" has the property, an order enforcing a

2  contract, it seems to me.  But, still, there are a

3  reasonably modest number of these compared with the universe

4  of commercial and residential foreclosures.

15:12  5          Contempt seems to be a uniquely ineffectual

6  tool at this stage in the procedure, Mr. Adler.  What do I

7  do?  Let her out for 90 days as punishment?

8          MR. ADLER:  I didn't want to raise that, Judge, but

9  obviously, that is --

15:12  10         THE COURT:  Well, I understand.  It's hard to see

11  it as a useful or --

12         MR. ADLER:  The other thing I would raise, Judge,

13  is this certainly could have been raised in discussions with

14  the government prior to her pleading guilty, and to sort of

15:12  15 force it on her now, when we could have perhaps used it to

16  negotiate a favorable plea agreement for her, also seems

17  unfair, if nothing else.

18         THE COURT:  Well, no.  I mean, I don't know why

19  assisting in the forfeiture is unfair.

15:13  20         MR. ADLER:  No.  Assisting is not in the

21  forfeiture, Judge, but it's clearly something the government

22  feels that it needs and thereby could have been a bargaining

23  chip to negotiate some sort of an agreement with her.

24         THE COURT:  I think she already agreed to give up

15:13  25 her right.  That's what agreeing to a forfeiture is.  This

1    is a different version of the same commitment.

2              I am going to think about this because I want

3    to make sure that we maintain as much of the value of the

4    properties as possible.  Perhaps I could give one of the

15:13    5    government lawyers to the title company as a hostage.

6              All right.  Are there any other problems?

7         MR. MAGLIOLO:  No, Your Honor.

8         THE COURT:  Miss DeGabrielle, would you please send

9    me the examples that you have, a copy of them.  Do you have

15:14    10   them in an editable form?

11        MS. DeGABRIELLE:  "Edible"?

12        THE COURT:  "Editable".

13        MS. DeGABRIELLE:  Yes.  I have it in electronic

14   form.

15:14    15        THE COURT:  As you have known for a number of

16   years, I skipped my diction classes.  It's the only thing

17   that kept me from being a famous country and western

18   singer -- well, that and not being able to sing.  I could

19   have stumbled into other fields of music, because,

15:14    20   apparently, in some of them it doesn't matter whether you

21   can sing or not.

22              In a digital form.

23        MS. DeGABRIELLE:  Yes, Your Honor.  And I can send

24   it to you.

15:14    25        THE COURT:  If you will just e-mail them to my case

```
 1  manager, please, ma'am.  I will look at them and think about
 2  this.  And do that with the order of restitution in case I
 3  want to --
 4              And are you sure they're all adults,
 5  Mr. Magliolo?
 6          MR. PEREZ:  May I have one moment, Your Honor?
 7          THE COURT:  Yes, sir.
 8          MR. PEREZ:  They're all adults now, Your Honor.  In
 9  fact, the youngest victim turned 18 this month.  So, they're
10  all adults now.
11          THE COURT:  All right.
12          MR. MAGLIOLO:  Yes, Your Honor.  I am sure.
13          THE COURT:  We're still using initials.  If we have
14  adults who are the beneficiaries of a restitution order, I
15  think we ought to go ahead and start doing things in their
16  names.  Shouldn't we?
17          MR. PEREZ:  One more moment.  Let me speak to the
18  agent because there are some issues in this case, Your
19  Honor.
20          MR. ADLER:  I will talk with my client, but I don't
21  think that she would have any problem not attaching a stigma
22  to any of these individuals by using their names.  Now,
23  whether it causes problems as far as getting money to --
24          THE COURT:  At some point we have to write a check
25  to somebody besides "RA".  The trust will have to be -- The
```

15:14 (line 5)
15:15 (line 10)
15:15 (line 15)
15:15 (line 20)
15:16 (line 25)

1   trust doesn't have to be put in the record, I don't guess.

2   The government can keep a copy.  Each girl could have a

3   copy, but....

4           MR. PEREZ:  The Government's position is, Your

15:16  5   Honor, to speak to the agent and other people involved in

6   this case.  If we could keep their initials, Your Honor,

7   because it's open to the public, it's open to the media

8   and --

9           THE COURT:  Okay.  No.  I'm -- Of course, that's

15:16  10  true of victims in all your other cases, and these were

11  anonymous because they were minors.

12          MR. PEREZ:  Yes, Your Honor.

13          THE COURT:  And that is -- But for this round I

14  guess we'll have to have a sealed document that -- because

15:17  15  we don't have any Social Security numbers or --

16          MR. PEREZ:  We really appreciate it, Your Honor.

17          MR. MAGLIOLO:  And maybe we can structure something

18  where we have some limited sealing except as to appropriate

19  parties.  We do have sometimes as to the lawyers and to the

15:17  20  U.S. Attorney's Office.  It may be that we can structure it

21  in such a way it won't be available to the general public

22  but be available to the people who needs it in order to

23  transfer the property --

24          THE COURT:  Some bank is going to have to look at

15:17  25  it if we don't keep the funds here.  If it's going to be a

1    trust, they'll probably want to see that there is a trust.

2    But the trust document can simply be kept private if it's

3    not filed at all.

4            MR. PEREZ:  And, again, we appreciate the Court --

15:18  5            THE COURT:  Yeah.  There's a continual conflict

6    between the public emphasis and the public administration of

7    justice and people not wanting to be identified.  With

8    children, it should be automatic that they're not, but as

9    adults it should be done with great care.  Anonymous

15:18  10   accusers, anonymous witnesses are a very bad thing to have.

11           MR. PEREZ:  Although they do know --

12           THE COURT:  They know.  This part is over.

13               All right.  I will add that to my list of

14   things to resolve.  But at the moment we'll do the -- I take

15:19  15   it, then, there has been no concern expressed by a title

16   company about the forfeiture order's terms.

17           MS. DeGABRIELLE:  Not the forfeiture order, Your

18   Honor.  If the assets are seized and forfeited by the United

19   States, there is a proceeding to quiet title in the

15:19  20   forfeiture statutes.  There's not such a thing in financial

21   litigation, unless we actually foreclose on the lien.  Then

22   there is a procedure by which title gets transferred.

23               What other districts in Texas do is appoint a

24   receiver, have the assets titled in the receiver's name and

15:19  25   have the receiver sell the property so there is no

1    continuation of title.  I think we can find an easier way to

2    do it, but --

3             THE COURT:  I mean, if it's forfeited to the United

4    States why can't the United States just deed it?

15:20  5             MR. MAGLIOLO:  It's not going to be forfeited to

6    the United States, Your Honor.  Miss Hayden can explain

7    that, but my understanding is it was forfeited to the United

8    States.  Then we have to ask the United States for

9    permission to do what we want to do.

15:20  10            THE COURT:  Well, we don't want to do that.

11            MR. MAGLIOLO:  I'm thankful for Miss Hayden that

12   she's explained all that to us.  And that's why we are -- it

13   took us a little while to figure out how to do it in a

14   manner to give the Court the latitude to do what the Court

15:20  15   wants to do.  And that's why we got Miss DeGabrielle

16   involved, because she -- between the two of them, then they

17   gave us directions on how to effectuate the Court's wishes,

18   and that's why we're proceeding in this manner.

19            MS. HAYDEN:  I understand what Your Honor is

15:20  20   saying.  I understand exactly.  And these are things that

21   need to be worked out.  I never thought that there shouldn't

22   be any problem because it's already titled to the United

23   States.  The problem is, to be titled to the United States

24   completely, you have to have a final order of forfeiture.

15:21  25   And you're familiar with a third-party ancillary proceeding

1    where you publish and you know the third parties.

2              So, at this point, FLU is going to come in.

3    There is not any lienholder that we're aware of expect for

4    one potential lienholder.  We're still going to publish

15:21    5    according to what our obligation is to do and then FLU is

6    going to -- instead of us going through the complete

7    process, the Financial Litigation Unit would then come in to

8    actually liquidate the properties.

9              And in forfeiture even sometimes, Your Honor,

15:21    10    with the title companies we're having problems.  Different

11    title companies require different things, and even with a

12    forfeiture order a lot of times they require a deed -- you

13    know, many times we'll have a warranty deed from the person

14    from whom the properties or the -- We are trying to work out

15:21    15    things.

16              The Marshal Service really does a good job

17    trying to work through these problems with the title

18    companies, but we do have issues with title companies

19    sometimes.

15:21    20              THE COURT:  Well, I know, but they're a lot like

21    some parts of the government who are used to checking Box A,

22    checking Box B, and court orders are not normally part of

23    that.  I mean, having closed a whole bunch of land

24    transactions, you would be surprised at the number of things

15:22    25    that don't fit standard operating procedures and it's

1   frustrating.  On the other hand, if I were going to put up

2   my money to guarantee title, I might be careful, but

3   sometimes it's just a reaction to the novelty rather than to

4   a substantive defect.

15:22   5           I mean, we know the title went in to

6   Miss Rojas.  Right?

7           MS. HAYDEN:  Yes, Your Honor.

8           THE COURT:  And it's a general warranty deed?

9           MS. HAYDEN:  Right.  Yes, Your Honor.

15:22  10           THE COURT:  And, so, what I said was whatever she

11   got she gets in restitution.  It should be easy.

12           MS. HAYNE:  And to be fair, Your Honor, we haven't

13   done this very often through the FLU section; so, it's all

14   being kind of explored.  But I agree with you.  I think with

15:23  15   the facts that we have it should be something that is not

16   going to present too many problems.

17           THE COURT:  All right.  What I would suggest is you

18   choose a title company and just simply go talk to them and

19   say, after we find out what you end up with, 'Here's what

15:23  20   the Court is doing.  Here's what the title in Miss Rojas

21   says.  What would you require to pass title to a third-party

22   purchaser?'

23           MR. MAGLIOLO:  Your Honor, could we just, for the

24   record -- if the Court is reluctant to order the Defendant

15:24  25   to sign the documents, could the Court on the record request

that the Defendant sign the documents and let the record be
clear that the Defendant will then refuse?

THE COURT:  Well, I did.  Her lawyer made a nice
little speech.

MR. MAGLIOLO:  Well, I mean, that was really
refused to sign for us.  The Court hadn't really requested
her to sign it.

THE COURT:  If I order her to do it I am going to
order it.  I'm not going to ask her, 'Will you obey an order
if I issue one?'

MR. MAGLIOLO:  Thank you, Your Honor.

THE COURT:  I am going to decide if that's the way
I want to approach this and then I am going to do it, and
then -- I am not going to put her to a hypothetical choice.

MR. MAGLIOLO:  Thank you, Your Honor.  Because it
would be my understanding that, if she was going to be found
in contempt, that would be dead time that would not apply
against the time that she has to serve.  So, there would be
a detriment to -- I believe.

THE COURT:  How long is the sentence?

MR. MAGLIOLO:  16 years, Your Honor, I believe.

MR. ADLER:  I believe that's correct, Your Honor.

THE COURT:  I don't know how realistic it is to
treat 90 days out of 16 years as a marginally effective
punishment.

1         MR. MAGLIOLO:  Well, I can remember in state

2  practice, Your Honor, where people would say they didn't do

3  a certain amount of time, but then they got to thinking that

4  when that time is up they want to go someplace else, and

15:25  5  another 60, 90, 120, 180 days is a significant amount of

6  time once your time is served.

7         THE COURT:  No.  I understand.  But my point is

8  thinking 16 years out is different from you can be out in a

9  year or a year and a quarter.  That's a human scale

15:25  10  perception.

11         MR. MAGLIOLO:  I understand.

12         THE COURT:  All right.  So, that's my suggestion,

13  is you talk to a title -- one or both of you talk to a title

14  company and say, 'Here's what we're doing.  What would you

15:26  15  require?' and then they can look up on their computer --

16         Do you have a title report?

17         MS. HAYDEN:  Yes, Your Honor, we do.  We have title

18  reports on all the properties.

19         THE COURT:  Carry it with you and say, 'Look.  We

15:26  20  have got warranty deeds going in to these people.  The Court

21  wants to order a transfer.  What else would you need?'

22         MS. DeGABRIELLE:  Yes, Your Honor.  I will do that.

23         MR. ADLER:  I am just impressed that Mr. Magliolo

24  can remember back when he practiced in state court.

15:26  25         THE COURT:  I can't hear you.

1          MR. ADLER:  I am impressed that Mr. Magliolo can

2    remember the time he remembered in state court at his age.

3          THE COURT:  I am impressed he can remember

4    anything.  He'd probably say that about me, too.

5               All right.  Thank you, counsel.

6

7                    COURT REPORTER'S CERTIFICATE

8          I, BRUCE SLAVIN, certify that the foregoing is a

9    correct transcript from the record of proceedings in the

10   above-entitled matter, to the best of my ability.

11

12                              *s/Bruce Slavin*
                                BRUCE SLAVIN, RPR, CM
13

14

15

16

17

18

19

20

21

22

23

24

25